Steven **BRAY**, Appellant,

v.

**COMMONWEALTH OF KENTUCKY**, Appellee.

No. 2003–SC–0656–MR.

Supreme Court of Kentucky.

Sept. 22, 2005.

Rehearing Denied Dec. 22, 2005.

Thomas M. Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Brian T. Judy, Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

In the early morning hours of November 8, 1982, a mobile home in Marshall County, Kentucky, burned to the ground. Inside, police found the bodies of Audrey Bray and her mother, Effie York, each with a gunshot wound to the head. Appellant, Steven Bray, who was Audrey's husband and Effie's son-in-law, was charged with the crimes.

In August 1998, a Marshall Circuit Court jury convicted Appellant of two counts of murder, KRS 507.020(1), and one count of arson in the first degree, KRS 513.020, and sentenced him to life in prison for each conviction. In *Bray v. Commonwealth*, 68 S.W.3d 375 (Ky.2002), we reversed those convictions and sentences and remanded for a new trial. Following a change of venue to the Christian Circuit Court, Appellant was retried and again convicted of two counts of murder and one count of arson in the first degree. He was sentenced to life imprisonment for each

murder conviction and to forty years imprisonment for the arson conviction. He appeals to this court as a matter of right, Ky. Const. § 110(2)(b), asserting the following claims of error: (1) admission of certain hearsay statements in violation of his Sixth Amendment right to confrontation; (2) insufficiency of the evidence to support his convictions; (3) denial of his motion for a continuance for the purpose of obtaining an independent competency evaluation; (4) failure to hold a competency hearing after ordering that a competency evaluation be performed by the Kentucky Correctional Psychiatric Center (KCPC) or its designee; and (5) failure to declare a mistrial after the prosecutor introduced evidence of Appellant's other bad acts.

## I. CONFRONTATION.

Just before midnight on November 7, 1982, Ernestine Goins, a resident of Alabama, received a telephone call from her sister, Audrey Bray. Audrey told Goins that she was "scared" and needed to talk. Audrey told Goins that she was looking out her front windows and could see Appellant sitting at the bottom of the hill. She said that he had been sitting there for "quite a while" and that she knew it was Appellant because she heard him coughing and could see him lighting his cigarettes. She stated that she could see Appellant carrying a flashlight and that she "feared for her life." Goins told her to call emergency services, but Audrey responded "I done called, and they won't come because it's a domestic problem and the law won't get involved until there has been someone hurt."

On Appellant's first appeal, we held that Audrey's statements identifying Appellant as the person sitting near her residence were properly admitted pursuant to the "present sense impression" exception to the hearsay rule. KRE 803(1); *Bray*, 68 S.W.3d at 381. During the interim, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), holding that the Confrontation Clause of the Sixth Amendment forbids admission of all[1] testimonial hearsay statements against a defendant at a criminal trial, unless the witness is unavailable and the defendant has had a prior opportunity for cross-examination. *Id.* at 68, 124 S.Ct. at 1374. Thus, the threshold issue under *Crawford* is whether Audrey's hearsay statements were testimonial.[2]

---

1. The Supreme Court recognized that, historically, an exception has been recognized for testimonial dying declarations. *Crawford*, 541 U.S. at 56 n. 6, 124 S.Ct. at 1367 n. 6. However, the Court declined to decide whether the Sixth Amendment incorporates such an exception, noting that if an exception must be accepted for historical reasons, it is *"sui generis."* Audrey Bray's statements to her sister clearly were not dying declarations.

2. Although the Supreme Court declined to specifically declare that the Confrontation Clause applies only to "testimonial," as opposed to non-testimonial, statements, *Crawford*, 541 U.S. at 61, 124 S.Ct. at 1370, other jurisdictions have uniformly confined their analysis to the testimonial/nontestimonial distinction, allowing the introduction of non-testimonial hearsay that fits within a well-recognized ("firmly rooted") exception to the hearsay rule or contains particularized guarantees of truthfulness. *E.g.*, *State v. Alvarez*, 210 Ariz. 24, 107 P.3d 350, 355–56 (App. 2005) (admission of nontestimonial hearsay statements under excited utterance exception); *State v. Doe*, 140 Idaho 873, 103 P.3d 967, 972 (App.2004) (same); *People v. Geno*, 261 Mich.App. 624, 683 N.W.2d 687, 692–93 (2004) (admission under Michigan's residual hearsay exception of nontestimonial hearsay statements similar to statements admissible under the "state-of-mind" exception [KRE 803(3)]); *State v. Hembertt*, 269 Neb. 840, 696 N.W.2d 473, 480–85 (2005) (admission of nontestimonial hearsay statements under excited utterance exception); *State v. Fisher*, 108 P.3d 1262, 1269 (Wash.Ct.App.2005)

To provide guidance for lower courts, *Crawford* explained:

> The text of the Confrontation Clause .... applies to "witnesses" against the accused—in other words, those who "bear testimony." "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

*Id.* at 51, 124 S.Ct. at 1364 (internal citations omitted). The Court stated that, at a minimum, the term "testimonial" applies to police interrogations and to prior testimony, whether at a preliminary hearing, before a grand jury, or at a former trial. *Id.* at 68, 124 S.Ct. at 1374. However, because the statement at issue in *Crawford,* a statement given under custodial interrogation by police, was "testimonial under any definition," *id.* at 61, 124 S.Ct. at 1370, the Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* at 68, 124 S.Ct. at 1374.

■ *Crawford* endorsed the view that statements were testimonial if, *e.g.,* they "were made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial." *Id.* at 52, 124 S.Ct. at 1364. The circumstances of the case *sub judice* did not present that situation. In *Crawford,* the declarant's statements were directed to police and in response to questioning. *Id.* at 38–39, 124 S.Ct. at 1357. Audrey Bray's statements, on the other hand, were spontaneous and were directed to her sister. *See United States v. Lee,* 374 F.3d 637, 645 (8th Cir.

2004) ("[Co-defendant's] statements to his mother do not implicate the core concerns of the confrontation clause."); *United States v. Manfre,* 368 F.3d 832, 838 n. 1 (8th Cir.2004) (statements were nontestimonial because they "were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks"); *People v. Butler,* 127 Cal.App.4th 49, 25 Cal. Rptr.3d 154, 161–62 (2005) (statements held not testimonial where "[n]o government official was present .... [and][t]he statements were made spontaneously to co-workers."); *People v. Coleman,* 16 A.D.3d 254, 791 N.Y.S.2d 112, 113–14 (N.Y.App.Div.2005) (statements held not testimonial where, although made to police, "did not result from structured questioning"); *State v. Staten,* 364 S.C. 7, 610 S.E.2d 823, 836 (App.2005) (statements held not testimonial where they were made to declarant's cousin and roommate). Audrey Bray's statements were not made under formal conditions that would give a witness time for reflection; they bear greater resemblance to "casual remark[s] to an acquaintance." *Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364.

Many courts have held that statements made to a 911 (emergency) telephone operator under similar circumstances are not testimonial in nature. *See, e.g., State v. Wright,* 686 N.W.2d 295, 302–03 (Minn.Ct. App.2004) (statements to 911 operator held nontestimonial where no evidence suggested the call was handled by the 911 operator under a formalized investigatory protocol, and the victims were providing information for immediate intervention and not for eventual prosecution); *Coleman,* 791 N.Y.S.2d at 113 (statements made to 911 operator held nontestimonial

(admission of nontestimonial hearsay statements made for purposes of medical diagnosis); *State v. Ferguson,* 216 W.Va. 420, 607

S.E.2d 526, 528–29 (2004) (admission of nontestimonial hearsay statements under excited utterance exception).

where declarant's "primary motivation was to call for urgent assistance, and not to phone in an anonymous accusation"); *State v. Mason*, 127 Wash.App. 554, 110 P.3d 245, 249 (2005) (statements made to 911 operator held nontestimonial because they were "made while in peril for the purpose of seeking protection, rather than for the purpose of bearing witness").

Appellant asserts that because Goins lived in Alabama and could not have prevented the crime, the only plausible reason for the telephone call was testimonial, *i.e.*, to let Goins know that if she (Audrey) were subsequently killed, Appellant was the perpetrator. We disagree. Both the content and the context of the conversation indicate that Audrey telephoned Goins in the throes of fear—not to provide evidence for use at a future trial, but to seek advice and assurance. She had already sought help from the police to no avail. Her frantic statements to Goins describing her ongoing observations were not indicative of the calculated reflections engaged in by one seeking to preserve evidence.

In *United States v. Arnold*, 410 F.3d 895 (6th Cir.2005), statements to a 911 dispatcher that defendant had threatened her with a gun were held to be testimonial under *Crawford* because the declarant would reasonably expect the statements to be used to prosecute the defendant. *Id.* at 903–04. *Arnold* explained that, under its facts, "it would be antithetical ... to suggest that [declarant] made the statement for any other reason than to establish that the alleged incidents occurred." *Id.* at 903. At first blush, *Arnold* appears to support Appellant's contention. However, in *United States v. Cromer*, 389 F.3d 662 (6th Cir.2004), the Sixth Circuit explained that "in the case of a crime committed over a short period of time, a statement ...

made before the crime is committed ... almost certainly is not testimonial." *Id.* at 673 (quoting Richard D. Friedman,. *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011, 1042–43 (1998)). In this case, Audrey's statements to her sister were made prior to the crime.[3] A declarant's fearful statements over the telephone that a crime may occur do not alone establish "circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial ...." *Crawford*, 541 U.S. at 52, 124 S.Ct. at 1364. The statements at issue here were not testimonial in nature, thus not within the type of hearsay absolutely precluded by *Crawford*.

## II. SUFFICIENCY OF THE EVIDENCE.

■■■ At trial, Appellant moved for directed verdicts of acquittal on all charges. His motions were overruled. On a motion for a directed verdict of acquittal, all fair and reasonable inferences are drawn in the Commonwealth's favor. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). On appellate review, we determine whether, under the evidence viewed as a whole, it was clearly unreasonable for the jury to have found the defendant guilty. *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky.1983).

### A. MURDER.

■■ Evidence at trial established that on October 9, 1982, Audrey Bray filed for a divorce from Appellant. She began packing clothes and sheets in a foot locker, purportedly in preparation to move to Alabama. About a week before her death, two of Audrey's friends, Teresa Hamm and

---

**3.** The declarant's post-crime statements in *Arnold* were made to a 911 dispatcher—another significant fact in that court's analysis. *Arnold*, 410 F.3d at 903.

Lisa Colver, accompanied her to the residence she had shared with Appellant to help her retrieve her belongings. While there, Appellant, with gun in hand, threatened Audrey that she would "never live long enough to live with anybody else," nor would she ever "live long enough to see Alabama." Frightened, Audrey and her friends immediately left the residence.

November 7, 1982, was to be Audrey's last night of work at the Country Crossroads Restaurant. She had put in her two weeks notice, explaining her intentions to move to Alabama. After she left work that day, Audrey returned to the residence of her mother, Effie York, where she had been staying since her separation from Appellant. As previously noted, just before midnight, Audrey telephoned her sister, Ernestine Goins, and told her that Appellant was sitting at the bottom of the hill just below York's residence holding a flashlight.

The next morning, around 4:00 a.m., Danny Nelson, who lived directly across the street from York, abruptly awoke to the sound of a gunshot. A few seconds later, he heard a second gunshot. He looked out the window but could not hear or see anything, so he lay back down. Several minutes later, he noticed that it had become very bright outside. He looked out the window again and saw York's residence engulfed in flames.

When police arrived at the mobile home, they found Audrey Bray and Effie York dead, both with gunshot wounds to the head. An expert testified at trial that the bullets used to kill the victims were .22 caliber magnum bullets. The Commonwealth proved that at the time of the murders, Appellant owned a .22 caliber magnum pistol.

Although the police immediately suspected Appellant, they could not locate him. The ensuing search and investigation led police to the Barkley Regional Airport, where, on November 11, 1982, they found Appellant's black Chevrolet pickup truck abandoned with the keys still in the ignition. Also, two tickets had been purchased with cash for the 7:05 a.m. flight to St. Louis. Inside the vehicle, detectives found two operable flashlights and a box containing squirrel tails. Two days later, on November 13, a janitor reported finding a partial box of fifteen .22 magnum caliber bullets abandoned in the airport's men's restroom. Testimony at trial showed that finding ammunition at the airport was rare; since 1974, ammunition had been found there on only three or four occasions. On November 15, the police searched a dumpster at the airport and found another squirrel tail and a "TVA" patch similar to one Appellant was known to own.

Although the FBI conducted an extensive manhunt, Appellant remained at large for more than twelve years. On October 26, 1994, police received a tip that Appellant was residing in Toronto, Canada. On February 2, 1995, police spotted a person fitting Appellant's description. When asked his name, he responded, "Walter Watkins." When asked to produce identification, he produced a Canadian birth certificate in the name of "Walter George Wilkins." After further questioning, police substantiated that the person was, in fact, Appellant and placed him under arrest. Appellant was thereafter extradited to Kentucky and tried for the murders and arson.[4]

A person is guilty of murder when he intentionally causes the death of

4. The extradition was obtained under an agreement between Canadian authorities and

the United States Department of Justice that prosecutors would not seek the death penalty.

another person. KRS 507.020(1)(a). Appellant argues that the evidence against him was insufficient because it was entirely circumstantial. However, circumstantial evidence can suffice to support a criminal conviction. *Baker v. Commonwealth,* 860 S.W.2d 760, 761 (Ky.1993). A conviction may be obtained upon circumstantial evidence when the evidence taken as a whole is of such character that a jury would not be clearly unreasonable in concluding that a person is guilty beyond a reasonable doubt. *Bussell v. Commonwealth,* 882 S.W.2d 111, 114 (Ky.1994). The same standard applies regardless of whether a case involves direct or circumstantial evidence. *Commonwealth v. Collins,* 933 S.W.2d 811, 815 (Ky.1996).

There was sufficient circumstantial evidence to support the jury's conclusion that Appellant murdered Audrey Bray and Effie York. The murders were committed one week after Appellant threatened Audrey that she would "not live to see Alabama" and on the very day Audrey intended to leave for Alabama. There was evidence tending to show that Appellant was at the crime scene and acting suspiciously just hours before the deaths were discovered. The bullets used were from a .22 caliber magnum pistol, and Appellant owned a weapon of that type. Within hours of the crime, Appellant had abandoned his vehicle at the airport. Bullets matching those at the crime scene were found discarded inside the airport. Appellant fled to Canada, was at large for more than twelve years, and concealed his identity upon being confronted by the authorities.

■ Appellant correctly argues that evidence of flight, standing alone, does not prove guilt beyond a reasonable doubt. *Vick v. United States,* 216 F.2d 228, 232 (5th Cir.1954). However, Appellant was not convicted on the basis of flight alone; as stated above, substantial other circumstantial evidence tied Appellant to the murders, *e.g.,* motive, opportunity, and his prior threats to kill Audrey. Moreover, evidence of flight has long been considered evidence of a consciousness of guilt. *Rodriguez v. Commonwealth,* 107 S.W.3d 215, 218–20 (Ky.2003); *Chumbler v. Commonwealth,* 905 S.W.2d 488, 496 (Ky. 1995); *Hord v. Commonwealth,* 227 Ky. 439, 13 S.W.2d 244, 246 (1928). A defendant's attempt to conceal his true identity by providing an alias to police also shows a consciousness of guilt. *Adkins v. Commonwealth,* 96 S.W.3d 779, 793 (Ky.2003); *Fugate v. Commonwealth,* 445 S.W.2d 675, 681 (Ky.1969), *overruled on other grounds by Sawhill,* 660 S.W.2d at 5. *See also United States v. Clark,* 184 F.3d 858, 869 (D.C.Cir.1999).

Appellant asserts that he gave an adequate explanation of why he fled the country. He testified that he and Audrey's siblings did not get along. His suspicions that they would blame him for the deaths of their loved ones and seek retribution compelled him to leave. He "just walked. Next thing [he] was close to Canada and just went on." However, for the purpose of ruling on a motion for directed verdict, the trial court must assume that the evidence for the Commonwealth is true and reserve for the jury questions as to the credibility and weight to be given to the evidence. *Benham,* 816 S.W.2d at 187–88. A reasonable jury could believe beyond a reasonable doubt that Appellant murdered Audrey Bray and Effie York. *Id.* at 187.

### B. ARSON.

Appellant asserts that the evidence was insufficient to convict him of arson in the first degree because the victims died of gunshot wounds to the head before the fire was started. Thus, he reasons, the statutory requirements for first-degree arson were not met because the residence

was not "inhabited or occupied," and he would not have had reason to believe it was; nor was any person seriously injured as a result of the fire. KRS 513.020(1). On Appellant's first appeal we held that an instruction on first-degree arson was properly given, because the "evidence was inconclusive as to whether the victims were living or dead at the time the house was set afire," *Bray*, 68 S.W.3d at 385, but that Appellant was entitled to an instruction on second-degree arson as a lesser included offense. *Id.*

▇ Appellant now asserts that "*as distinguished from appellant's first trial*, the evidence left no doubt as to whether the victims were dead or alive when the house was set on fire." Brief for Appellant, at 44 (emphasis added). He argues that neither victim could have been alive due to the amount of carbon monoxide in the blood stream of each. Dr. Roberta Conrad, who performed the autopsies of both victims, testified for the prosecution during the first trial regarding the amount of carbon monoxide in the victims' bloodstreams. During Appellant's second trial, the prosecution played for the jury the videotape of Dr. Conrad's testimony given at Appellant's first trial. Obviously, the evidence regarding the victims' times of death, whether they occurred before or after the setting of the fire, *i.e.*, Dr. Conrad's testimony, was exactly the same at the second trial as it was at the first trial. Thus, our determination on the first appeal that the evidence was sufficient to support Appellant's conviction of arson in the first degree is the law of the case. *Thomas v. Commonwealth*, 931 S.W.2d 446, 450 (Ky. 1996). Furthermore, the evidence was also not conclusive as to whether Appellant had reason to believe that both victims were still alive when he set the fire. KRS 513.020(1)(a).

## III. COMPETENCY HEARING.

Prior to his first trial, Appellant moved for a mental evaluation and treatment. Dr. Robert Sivley conducted the evaluation, diagnosing Appellant with adjustment disorder and paranoid personality disorder, manifested by a pervasive distrust and suspiciousness of others. Ultimately, however, he concluded that Appellant was indeed competent to understand the charges against him and to participate rationally in his own defense. The trial court agreed, finding Appellant competent to stand trial. RCr 8.06. The issue of Appellant's competency was not raised on the first appeal. After reversal and remand of Appellant's first convictions, Appellant notified the Commonwealth of his intent to present evidence of his paranoid personality disorder, pursuant to RCr 7.24(3)(B)(i) (notice of evidence of mental disease or defect bearing on the issue of guilt). As a result, the Commonwealth requested a mental examination pursuant to RCr 7.24(3)(B)(ii). The trial court ordered Appellant to be evaluated by the KCPC, but the form order recited that "[p]ursuant to KRS 504.100, upon motion of the Commonwealth, and the Court being satisfied that the Defendant should be re-evaluated to determine his/her competency to stand trial and criminal responsibility at the time of the offense ...."

Dr. Frank Deland conducted the evaluation. He diagnosed Appellant with "paranoid personality traits" and concluded that Appellant "does not ... lack substantial capacity to understand the procedures against him or meaningfully participate in his own defense." Appellant immediately filed a motion for a competency hearing, asking the court to (1) find Appellant incompetent to stand trial, or, alternatively, (2) provide Appellant with funds to hire an expert on the issue of competency, and (3) continue the trial date until such evalua-

tion could be completed. The trial court denied the motion entirely, never holding a competency hearing. On appeal, Appellant argues that it was error for the trial judge not to grant him funds and a continuance in order to allow him time to hire an independent expert. Additionally, he asserts that the failure to hold the competency hearing was reversible error.

KRS 504.100(1) requires a court to "appoint at least one (1) psychologist or psychiatrist to examine, treat and report on the defendant's mental condition," whenever it "has reasonable grounds to believe the defendant is incompetent to stand trial." KRS 504.100(3) states, "After the filing of a report (or reports), the court shall *hold a hearing to determine whether or not the defendant is competent to stand trial.*" We have held that "Section (3) is clearly mandatory." *Mills v. Commonwealth,* 996 S.W.2d 473, 486 (Ky.1999). However, as in *Mills,* the trial court's error in this case was obviously harmless. In the first place, the Commonwealth's request for a mental examination was not for competency purposes but to obtain evidence to rebut Appellant's intent to present a defense of mental illness or defect. The trial court did not state a belief that Appellant might be incompetent to stand trial. He simply signed the wrong form order.

▬▬ Nevertheless, the standard of review when the trial court fails to hold a competency hearing is, "Whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Williams v. Bordenkircher,* 696 F.2d 464, 467 (6th Cir. 1983) (quoted in *Mills,* 996 S.W.2d at 486). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, *and any prior medical opinion on competence to*

*stand trial* are all relevant" facts for a court to consider. *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975) (emphasis added). To show that he was incompetent to stand trial, Appellant cites Dr. Deland's report and Appellant's own allegedly bizarre testimony at trial. However, Dr. Deland's report specifically concludes that Appellant was competent to stand trial. More importantly, it repeats essentially the same information and conclusions as Dr. Sivley's report, on which the trial court relied in determining prior to the first trial that Appellant was competent to stand trial. Where Sivley had reported, "[Appellant] expresses a strong suspicion of [the] corruptness [of the court system] and of its determination to punish him," Deland reported, "[Appellant] believes that Judge Foust's court is necessarily tendentious and will not yield to the principles of fairness unless forced." Furthermore, Deland reported,

> [Appellant] admits, though that the judicial system in Kentucky, overall, is as just as one could expect, his citing the successful appeal as evidence. Thus, Mr. Bray's suspicions do not include the entire judicial process, only the process specific to his case as it is being conducted at this time. *That Mr. Bray can make such a distinction strongly suggests that his paranoid thoughts are under some amount of cognitive control and that he is making a valued judgment about his course of action at this time.*

(Emphasis added.) In another example, Sivley had stated that "he seems to believe that he cannot have a defense attorney who will act in his own interest." Likewise, Deland reported, "[He is] overly suspicious of his current attorney," but Deland further stated:

> Mr. Bray states that he has no personal animosity towards his lawyer or any of

the other court personnel, he only objects to their official functioning as it pertains to his case in particular. *Again, that Mr. Bray can make such distinctions strongly suggests that his judgments about what actions he will take with regard to his defense strategy are considered ones and not irreversible.*

(Emphasis added.) Appellant correctly points out that Deland's report confines Appellant's paranoia to his dealings with the court and his attorneys. However, it is that conclusion that caused Deland to more vigorously conclude that:

> [Appellant] has the ability to adjust his stance and strategy such that he could work with his attorney effectively. His refusal to do so, I believe, would be a considered action on his part and not one that is mandated by blind adherence to his paranoid ideations.

Thus, Deland's report does not support Appellant's argument on appeal. Because the two psychological opinions were virtually identical, except that Deland's was more emphatic, and because Appellant was deemed competent after a hearing on Sivley's opinion, a reasonable judge would have no reason to further doubt Appellant's competency. *See Pate v. Commonwealth*, 769 S.W.2d 46, 47 (Ky.1989) ("There is no right to a continual succession of competency hearings in the absence of some new factor.").

Appellant additionally points to an instance during his trial testimony where he accused a local police officer of assisting him in his escape. The prosecutor, judge, and defense counsel were equally surprised by the testimony, defense counsel stating that he had never been apprised of that accusation. Appellant asserts that this bizarre accusation should have given the judge reasonable doubt as to whether he could "participate rationally in his ...

defense," RCr 8.06, thus requiring the judge to grant Appellant a continuance in order to have another evaluation performed. We disagree. That Appellant was suspicious of his defense counsel was clear after Appellant's first mental examination by Dr. Sivley and was reinforced by Dr. Deland's examination. However, it was clear that both doctors viewed Appellant's suspicion as a considered action on his part, not one "mandated by blind adherence to his paranoid ideations." His accusation at trial did not affect that opinion. *Pate*, 769 S.W.2d at 47. Furthermore, though bizarre, there was no proof that Appellant's accusation was untrue.

Accordingly, a reasonable trial judge would have had no factual basis to doubt Appellant's competence. Therefore, no error occurred in denying Appellant's request for an additional examination, and it was harmless error for the court to deny Appellant a competency hearing. *Mills*, 996 S.W.2d at 486.

### IV. OTHER BAD ACTS.

Appellant next alleges that a mistrial was warranted after the prosecutor cross-examined Appellant regarding the following incidents:

Q: Isn't it true that you weren't supposed to have any contact with Audrey?

A: No ma'am.

. . .

Q: Do you recall ever crawling out a bathroom window after an officer tried to talk with you?

A: No ma'am.

. . .

Q: Who's Bubba Greek?

A: [no response]

Q: Isn't Bubba Greek the person that Audrey was going to Alabama to see?

A: No. That's not the reason she went to Alabama.

Q: Didn't you call Bubba Greek on the telephone and threaten him?

A: I didn't. No ma'am.

Thereafter, defense counsel objected and requested a mistrial. He argued that this last question about a threat made to a person named Greek was irrelevant and prejudicial. The prosecutor then withdrew the question, and the trial court denied Appellant's motion for a mistrial. Appellant did not request an admonition to the jury to disregard the testimony. On appeal, Appellant incorporates the two immediately previous questions into his argument, asserting that the three accusations were purposefully interjected into the case but were never substantiated by proper evidence. We address only the error involved in the last of the three questions because it was the only issue preserved for our review, and Appellant does not request palpable error review pursuant to KRE 103(e).

 Whether to grant a mistrial is within the sound discretion of the trial court, and "such a ruling will not be disturbed absent ... an abuse of that discretion." *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky.2004). A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity. *Skaggs v. Commonwealth*, 694 S.W.2d 672, 678 (Ky.1985), *habeas corpus granted on other grounds by Skaggs v. Parker*, 235 F.3d 261, 275 (6th Cir.2000). The error must be "of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way [except by grant of a mistrial]." *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky.1996).

This type of error is easily cured by an admonition. In *Graves v. Commonwealth*, 17 S.W.3d 858 (Ky.2000), a witness made reference to the defendant's prior criminal conviction by stating, "I knew he wasn't supposed to have a gun." *Id.* at 865. We held that an evidentiary error of that type was easily curable by an admonition, but that an admonition was not requested. *Id.* A mistrial, on the other hand, was clearly unwarranted. *Id.* In the case *sub judice*, the prosecutor's question was fleeting. It was asked, objected to, and immediately withdrawn. Had Appellant requested an admonition, any prejudicial effect that may have occurred could have been cured.

Appellant insists that reversal is required pursuant to *Coates v. Commonwealth*, 469 S.W.2d 346 (Ky.1971), and *Woodford v. Commonwealth*, 376 S.W.2d 526 (Ky.1964). The defendant in *Coates*, an official with access to the State Reformatory, had been tried for possession of marijuana. During cross-examination of the defendant and again during closing argument, the Commonwealth's attorney implied that the defendant had been trafficking illicit drugs into the Reformatory. However, the Commonwealth never introduced any evidence to support its implications. Our predecessor court held that the Commonwealth had interjected a "false issue" into the case "which was highly prejudicial." *Coates*, 469 S.W.2d at 348. The issue of drug trafficking at that time was a "highly inflammable matter and the public generally is incensed against those who induce the use of and supply [of] drugs." *Id.* No similar prejudice was created here. In *Woodford*, the prosecutor asked the defendant repeatedly if he had been pursued by police officers in a chase. Although defense counsel voiced several objections, the questioning continued. *Woodford*, 376 S.W.2d at 527–28. No such repetition occurred here. No manifest ne-

cessity for a mistrial existed, and no abuse of discretion occurred.

Accordingly, the judgment of convictions and the sentences imposed by the Christian Circuit Court are AFFIRMED.

All concur.