RENDERED: SEPTEMBER 25, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0864-MR

DALE BRUCKER          APPELLANT

APPEAL FROM TAYLOR CIRCUIT COURT
v.      HONORABLE SAMUEL TODD SPALDING, JUDGE
ACTION NO. 18-CR-00257-011

COMMONWEALTH OF KENTUCKY          APPELLEE

AND          NO. 2019-CA-1403-MR

DALE BRUCKER          APPELLANT

APPEAL FROM TAYLOR CIRCUIT COURT
v.      HONORABLE ALLAN RAY BERTRAM, JUDGE
ACTION NO. 13-CR-00025-001

COMMONWEALTH OF KENTUCKY          APPELLEE

BEFORE: CLAYTON, CHIEF JUDGE; TAYLOR AND L. THOMPSON, JUDGES.

CLAYTON, CHIEF JUDGE: Dale Brucker was involved in a disturbance at the Taylor County Detention Center while serving an alternative sentence for manslaughter and being a persistent felony offender. He was convicted by a jury of inciting to riot and complicity to commit first-degree criminal mischief and his probation in the manslaughter case was revoked. He brings these related appeals from the Taylor Circuit Court's final judgment and sentence in the riot case (18-CR-00257-011), entered on May 7, 2019, and its order revoking probation in the manslaughter case (13-CR-00025-001), entered on August 16, 2019. In the first appeal (2019-CA-0864-MR), Brucker challenges the sufficiency of the evidence supporting his convictions as well as rulings of the trial court relating to the admissibility of evidence and cell phone use by jurors; in the second appeal (2019-CA-1403-MR), he argues that the revocation of probation violated his due process rights. Having reviewed the record and the applicable law, we affirm in both appeals.

On January 23, 2013, Brucker was indicted on charges of murder and being a persistent felony offender in the first degree. Pursuant to an agreement

with the Commonwealth, he entered an Alford[1] plea of guilty to amended charges of manslaughter in the second degree and being a persistent felony offender in the second degree. On July 24, 2018, the trial court imposed an alternative sentence of twelve years, probated for five years, with the requirement that he serve seven months and twenty-one days in jail prior to being released on probation. He was remanded into custody immediately following the sentencing hearing and was incarcerated at the Taylor County Detention Center. A written judgment reflecting the sentence imposed by the trial court was entered on August 31, 2018.

On July 31, 2018, seven days after the entry of his guilty plea, Brucker was involved in a riot at the detention center. He was convicted by a jury of inciting a riot, complicity to commit first-degree criminal mischief (wanton), and being a persistent felony offender in the second degree. A final judgment and sentence was entered on May 7, 2019. He received a sentence of five years to be run consecutively with the earlier sentence in the manslaughter case.

The Commonwealth had previously moved to revoke Brucker's probation in the manslaughter case on the grounds he had been charged with a new felony offense in the riot case. Brucker argued he did not have adequate notice

---

[1] A plea pursuant to *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed.2d 162 (1970), "permits a conviction without requiring an admission of guilt and while permitting a protestation of innocence." *Wilfong v. Commonwealth*, 175 S.W.3d 84, 103 (Ky. App. 2004). "The entry of a guilty plea under the *Alford* doctrine carries the same consequences as a standard plea of guilty." *Id.* at 102 (internal quotation marks omitted).

-3-

that the commission of a new felony would be a violation of the conditions of his probation and the new charge could not serve as the basis for a revocation of probation. Following a hearing, the trial court entered an order on August 16, 2019, revoking probation in the manslaughter case, citing Brucker's conviction for the offenses connected with the prison riot as the grounds.

Brucker brings these appeals from the final judgment entered following his jury trial and from the order revoking his probation. Additional facts will be set forth below as necessary.

**2019-CA-0864-MR**

At the time Brucker was sent to the Taylor County Detention Center to serve his alternative sentence in the manslaughter case, the center had recently implemented new safety measures intended to reduce assaults and drug trafficking among the inmates. These measures included leaving the lights on permanently in the cells, rather than switching them off at night, and applying tint to the cell windows, which allowed the guards to see into the cells but prevented the inmates from looking out.

The detention center is laid out with aisles branching from a central command post where the guards monitor the surveillance cameras in the cells. Brucker was housed in a cell which had beds for 28 inmates but on the day of the riot housed 35 inmates. According to the testimony of Derek Taylor, one of

Brucker's cellmates, the lights being left on 24 hours per day interfered with the inmates' ability to monitor the passage of time and keep to a routine. On the night before the riot, a guard came through the cell at around 10:00 p.m. and switched off the lights at the request of the inmates. The next evening, however, the lights were not switched off. Taylor said the inmates could not sleep and were feeling rowdy in the overcrowded cell. Brucker used his blanket to make a curtain around his bunk, but the cell remained noisy because the lights were on. Brucker woke up at about 12:30 a.m. and asked why the lights were still on. He became agitated and upset because he could not sleep.

Captain Adam Burress testified that the surveillance video of the cell showed the inmates were either sleeping or socializing peacefully in the time leading up to the riot. The video showed Brucker get out of bed at 12:30 a.m. and rouse the others by pacing and ranting. Brucker used a broom and his shirt to flag the surveillance camera to get the attention of the guard in the control room to turn off the lights. He shouted and cursed at the guards to turn off the lights. The guard responded over the loudspeaker but could not be heard over the noise in the cell. According to Deputy Matthew Freer, who was in the control room, Brucker was the main person deputies were communicating with when the riot started. Deputy Ashley Dobson testified that she was in the control room and saw Brucker wave the broom at the camera and demand that the lights be turned off. She heard

-5-

Brucker say: "If the lights don't go off, there's going to be hell to pay." Deputy Tyler Harrod testified that only after Brucker waved the broom at the camera a second time did the other inmates become irate and aggressive. Sergeant James Gaddis testified that he watched Brucker pacing the cell and getting all the other inmates "stirred up."

Brucker joined a group of inmates trying to cover the surveillance cameras using wet toilet paper. According to Brucker, he thought the other inmates were trying to get the officers to respond as no one had come to the cell when they used the broom. The wet toilet paper fell off the camera at first, but the men eventually succeeded in covering the camera. The inmates, including Brucker, began beating on the tables and windows. According to Brucker, he felt the situation had gone too far when an inmate cracked a window using a sock full of dominoes. He and Derek Taylor testified that they sat on a bunk together and did not participate in any of the subsequent damage or destruction of property. Brucker also denied encouraging anyone else to do so.

The inmates pulled up a bunk bed that was bolted to the floor and rammed the cell door with it, breaking the doorframe. The Jailer, Jack Marcum, was notified and arrived at the detention center with officers from the sheriff's office and the state police. They tried to use pepper spray through the opening in the cell door but the bunk bed blocked it. Eventually about 25 officers entered the

cell and handcuffed the inmates, who were subsequently transferred to other facilities.

The cell was badly damaged. All the windows were shattered, the microwave and television were destroyed, sheets and books were torn apart, and the door to the cell was nonoperational with the door frame pushed out and the concrete surrounding the door cracked. Part of the floor was missing where the bunk bed had been pulled loose from where it was bolted.

Brucker was ultimately convicted by a jury of one count of inciting a riot and one count of complicity to commit criminal mischief, under a wanton theory. He was acquitted of charges of attempted escape and tampering with physical evidence.

Brucker argues he was entitled to a directed verdict on the charge of inciting a riot because the Commonwealth failed to prove every element of the offense beyond a reasonable doubt. "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

The pertinent statute provides that "[a] person is guilty of inciting to riot when he incites or urges five (5) or more persons to create or engage in a riot." Kentucky Revised Statutes (KRS) 525.040(1). "Riot" is defined as "a public

disturbance involving an assemblage of five (5) or more persons which by tumultuous and violent conduct creates grave danger of damage or injury to property or persons or substantially obstructs law enforcement or other government function." KRS 525.010(5). The Commentary to KRS 525.040 states that "[t]he intent of the provision is to protect freedom of speech on the one hand and the public's right to peace and tranquility on the other." In the context of a prison setting, an inmate's freedom of speech rights must be balanced against "legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261, 96 L. Ed. 2d 64 (1987).

Brucker acknowledges that he yelled at the guards to turn off the lights, that he used curse words, and banged on the tables and windows. He also admits he waved a broom at the surveillance camera but points out that the Commonwealth acknowledged this was a common practice for getting the guards' attention. He questions the credibility of Deputy Dobson's testimony that he said there would be hell to pay if the lights were not turned off because she failed to include this crucial statement in her report of the riot. He contends that the mere fact the other inmates looked at him as he complained and tried to get the guards' attention does not show he intended to incite a riot and that any causal connection between his actions and those of the other inmates is purely conjectural.

But evidence was also presented that Brucker was the first inmate who expressed and displayed anger at the lights being left on, and the other inmates did not become restless until after Brucker cursed at the deputies over the security camera. Testimony from Sergeant Gaddis and Deputy Harrod confirmed that Brucker caused the other inmates to become agitated. Although Taylor testified that Brucker quieted down after waving the broom and spent the rest of the time sitting with him on one of the bunks, the cell surveillance video showed Brucker pacing the floor and helping the others cover the camera. "[J]udgment as to the credibility of witnesses and the weight of the evidence are left exclusively to the jury." *Fairrow v. Commonwealth*, 175 S.W.3d 601, 609 (Ky. 2005). "[W]e entrust to the wisdom of the twelve men and women who comprise the jury the responsibility to sort between the conflicting versions of events and arrive at a proper verdict." *Newkirk v. Commonwealth*, 937 S.W.2d 690, 696 (Ky. 1996). It was well within the jury's province to assess the credibility of the witnesses and to assign more weight to the testimony of Dobson than to Taylor.

"The 'normal activity' to which a prison is committed – the involuntary confinement and isolation of large numbers of people, some of whom have demonstrated a capacity for violence – necessarily requires that considerable attention be devoted to the maintenance of security." *Hopkins v. Smith*, 592 S.W.3d 319, 323 (Ky. App. 2019) (quoting *Pell v. Procunier*, 417 U.S. 817, 826-

27, 94 S. Ct. 2800, 41 L. Ed. 2d 495 (1974)). Particularly when viewed within this context, it was not unreasonable for the jury to conclude that Brucker's actions and words incited his cellmates to participate in a riot.

Next, Brucker argues there was insufficient evidence to convict him of complicity to commit criminal mischief. "A person is guilty of criminal mischief in the first degree when, having no right to do so or any reasonable ground to believe that he or she has such right, he or she intentionally or wantonly . . . [d]efaces, destroys, or damages any property causing pecuniary loss of $1,000 or more[.]" KRS 512.020(1)(a). Complicity is defined as follows: "When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he . . . [a]ids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result[.]" KRS 502.020(2)(b).

Brucker argues that the Commonwealth failed to present sufficient evidence that he actively participated and aided in the actions of the inmates that resulted in the damage to the detention center. He contends that the Commonwealth acknowledged that it lacked such evidence when the prosecutor stated in his closing remarks that there was no evidence to suggest that Brucker damaged anything, broke the window or the door, or pulled up the bed.

-10-

But "[a] person can be guilty of 'complicity to the result' under KRS 502.020(2) without the intent that the principal's act cause the criminal result, but with a state of mind which equates with the kind of culpability with respect to the result that is sufficient for the commission of the offense, whether intent, recklessness, wantonness, or aggravated wantonness." *R.S. v. Commonwealth*, 423 S.W.3d 178, 185 (Ky. 2014) (internal quotation marks and citation omitted). "Importantly, under 'complicity to the result,' an accomplice's liability and the principal actor's liability can be at different levels. And proof that another caused the prohibited result is all that is required. Indeed, only the defendant/accomplice's mental state is at issue." *Id.* (internal quotation marks and citations omitted).

Thus, the Commonwealth did not need to prove that Brucker acted with intent to cause the specific damage to the cell or engaged in the criminal conduct that led to the damage. It merely needed to show that he acted wantonly in aiding the principals who did cause the damage. In addition to instigating the riot and rousing his fellow inmates, Brucker assisted in successfully covering the surveillance camera. Although Brucker claimed he participated in covering the camera solely to get the guards' attention, the jury could infer that he acted wantonly in doing so as it concealed the ensuing destruction of the cell from the guards.

Next, Brucker argues that the trial court abused its discretion in denying his motion for a mistrial after it was discovered that members of the jury had been using their cell phones. "A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity." *Graves v. Commonwealth*, 285 S.W.3d 734, 737 (Ky. 2009) (quoting *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky. 2005)). "Specifically, the decision should be based on whether the complained of 'event . . . prevented the [party] from receiving a fundamentally fair trial.'" *Id.* (citation omitted). We review the trial court's denial of a mistrial for abuse of discretion. *Id.* "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

The jurors were not told at the beginning of the proceedings that cell phones were not permitted. Neither the prosecutor nor defense counsel requested such an announcement from the trial court. It was only discovered during the penalty phase deliberations that the jurors had their cell phones and that several jurors had used them. The defense moved for a mistrial. The trial court stated it would only grant a mistrial if there was some evidence that the phones had been used in a manner that could potentially have compromised the verdict. The jurors were brought individually into the courtroom and questioned about their cell phone

usage. Three jurors admitted they had their cell phones with them during deliberations but testified they used them for personal purposes only. One of the jurors, for example, sent a text to his wife to let her know he would be late getting home and lent the phone to another juror to text her mother about childcare. Another juror explained he borrowed a phone to call his wife to contact his employer and give notice for his work shift that night as the deliberations were running late. The trial court denied the motion for a mistrial.

Brucker argues that the trial court's questioning of the jurors was inadequate because the jurors, after being individually questioned, were allowed to return to the same room where presumably they could have discussed the matter amongst themselves. Brucker does not provide a citation to the record showing he objected to this procedure. In any event, this argument is purely speculative and certainly does not merit a mistrial.

Brucker also faults the trial court for not asking each juror specifically about using the phones to access Facebook or other social media contacts. Brucker did not request the trial court to make such an inquiry and consequently this argument is not preserved for appeal. "[A]n appellant preserves for appellate review only those issues fairly brought to the attention of the trial court. . . . A new theory of error cannot be raised for the first time on appeal." *Elery v. Commonwealth*, 368 S.W.3d 78, 97-98 (Ky. 2012) (internal quotation marks and

citations omitted). In the absence of any evidence that the use of the cell phones improperly influenced the deliberations of the jury and resulted in an unfair trial, the trial court did not abuse its discretion in denying the motion for a mistrial.

Finally, Brucker argues that the trial court erred in admitting Commonwealth's Exhibit 1, an itemized list of the estimated expenses associated with repairing the damage to the cell where the riot took place. The amount totaled $8,413.56, well over the $1,000 threshold to sustain a conviction for first-degree criminal mischief. KRS 512.020(1). Brucker's trial counsel objected to the introduction of the document, claiming the defense had never received it in discovery.

When the Commonwealth sought to introduce Exhibit 1, defense counsel objected, explaining that the document was not included in the discovery packet. After the Commonwealth insisted that the document had been included in discovery, defense counsel pointed out that the exhibit was not numbered in the same manner as the rest of the discovery documents. The trial court commented that Brucker's defense counsel had inherited the case and documents frequently get lost in the shuffle. Brucker's counsel did acknowledge that the estimate was listed in the Commonwealth's bill of particulars. The bill of particulars, which was filed shortly after the indictment and over four months prior to trial, listed an "Estimate[d] cost of damages" as one of the documents in the possession of the

Commonwealth, thus providing notice of its existence to the defense. The trial court allowed the exhibit to be admitted into evidence.

"We review a trial court's ruling on the admissibility of evidence for an abuse of its discretion." *Chames v. Commonwealth*, 405 S.W.3d 519, 522 (Ky. App. 2012). We apply the same standard when reviewing a trial court's ruling regarding a discovery violation. *Wilson v. Commonwealth*, 381 S.W.3d 180, 191 (Ky. 2012).

The trial court's decision to admit the document was not an abuse of discretion because there is no clear evidence of a discovery violation. In any event, substantial evidence of the damages to the cell was introduced in the form of numerous photographs showing the damage to the door, floor, windows, the metal bunk bed, the television, and the microwave. Additionally, Deputy Freer described the situation as resembling a tornado going through the cell. On the basis of this evidence, the jury could infer that the damages were well over $1,000.

For the foregoing reasons, the judgment and sentence of the Taylor Circuit Court is affirmed.

### 2019-CA-1403-MR

In his second appeal, Brucker argues that his due process rights were violated when his probation was revoked for the offenses committed in connection with the riot at the detention center. As previously outlined, Brucker was indicted

in 2013 for murder and being a persistent felony offender in the first degree. Pursuant to an agreement with the Commonwealth, he entered a plea of guilty to amended charges of second-degree manslaughter and second-degree PFO. He was sentenced on July 24, 2018, to an alternative sentence of twelve years, probated for five years, with the requirement that he serve seven months and twenty-one days before being released on probation. The trial court denied his motion to serve the seven months and twenty-one days on home incarceration. The final written judgment in the case was not entered until August 31, 2018.

Meanwhile, Brucker was sent immediately to the detention center where he was involved in the riot on July 31, 2018. On October 24, 2018, the Commonwealth moved to revoke his probation on the grounds he had been charged with a new felony offense in connection with the disturbance. Brucker moved to dismiss the motion, arguing that because the written judgment imposing sentence was not entered until after the commission of the new felony offense he did not receive adequate notice of the conditions of probation.

At the probation hearing, which was held on May 7, 2019, after Brucker had been convicted and sentenced in connection with the riot, a probation officer testified that officers typically meet with probationers when they are released from custody to begin their period of probation, and the conditions of probation are reviewed at that time. Because Brucker was incarcerated and had not

-16-

yet begun probation nor met with his probation officer when he committed the new offenses, he argued he was not given adequate notice of the conditions of his probation. The trial court rejected this argument, observing that it could lead to a situation in which a defendant released on probation could fail to report to his probation officer and commit a new offense without suffering any impact on his probation. The trial court subsequently entered an order revoking Brucker's probation.

Brucker argues that the revocation violated his due process rights because the final judgment had not yet been entered and his probationary period had not yet commenced when he committed the criminal offenses associated with the riot; he did not receive actual or written notice of the terms of his probation; and no conditions of probation were listed in the final judgment.

Brucker's argument that the revocation was premature would appear to be resolved by *Brown v. Commonwealth*, 564 S.W.2d 21 (Ky. App. 1977), in which the appellant claimed that only an individual who had actually commenced probation could have his probation revoked. "Otherwise, he assert[ed], there are no conditions of probation which a potential probationer could violate and hence he would have no notice as to a course of conduct by which he could avoid revocation." *Id.* at 23. The Court disagreed, stating: "Sound policy requires that courts should be able to revoke probation for a defendant's offense committed

before the sentence commences; an immediate return to criminal activity is more reprehensive than one which occurs at a later date." *Id*. (quoting *United States v. Ross*, 503 F.2d 940, 943 (5th Cir. 1974)). Thus, under *Brown*, there was nothing to prevent the trial court from revoking Brucker's probation for committing an offense before the commencement of his period of probation.

Brucker argues that *Brown* is distinguishable, however, because the criminal defendant in that case received actual notice that committing a criminal offense would violate the conditions of his probation. Brucker did not receive such actual notice and contends that his situation is more akin to that of the appellant in *Patton v. Commonwealth*, No. 2011-CA-0101-MR, 2012 WL 592331 (Ky. App. Feb. 24, 2012). Patton entered a plea of guilty to several offenses, was sentenced by the trial court, and was ordered to report to the Office of Probation and Parole. When he did so, he appeared to be intoxicated and was arrested. His probation was subsequently revoked. In an unpublished opinion, a panel of this Court vacated the revocation because the appellant "was not given the terms of probation nor did he receive notice of what term he violated[.]" *Id*. at *1. In so ruling, the Court relied on KRS 533.030(5), which provides that "[w]hen a defendant is sentenced to probation or conditional discharge, he shall be given a written statement explicitly setting forth the conditions under which he is being released." Brucker did not receive such a written statement.

-18-

Nonetheless, Brucker's situation is significantly different from Patton's. While it is entirely plausible that a defendant might not know that alcohol use, which is legal under other circumstances, is not permitted under the conditions of his probation, it is inconceivable that a defendant would not know that committing a criminal offense while under sentence for another offense would be without consequences. In *Tiitsman v. Commonwealth*, 509 S.W.2d 275 (Ky. 1974), the defendant claimed that he had filed a motion for probation but was unaware the motion had been granted. Consequently, he had not been "advised of the conditions of the probation and not knowing of those conditions he could not be held accountable for a violation of them." *Id.* at 276. The then-Court of Appeals rejected this argument, stating:

> We find the motion to vacate the judgment revoking the probation to be entirely without merit. Assuming that appellant may not have had knowledge of the probation of his sentence, or the conditions thereof, we cannot accede to appellant's view that his subsequent commission of crime must be ignored by the court as a factor in a revocation hearing. Every person on probation or who has a motion for probation pending must be charged with knowledge that subsequent criminal behavior may have some bearing upon his probation or his motion for probation. In appellant's case his knowledge of whether his motion for probation had been sustained or was still pending was immaterial for in either event the court had every right to consider his subsequent criminal behavior in determining on the one hand whether to grant the probation or on the other whether to revoke it if it had already been granted.

*Id.*

Numerous other courts have stated that it is implicit in a grant of probation that the defendant refrain from violating the law. The Appellate Court of Connecticut, for example, has stated: "Due process does not require that the defendant, in a revocation of probation proceeding based on criminal activity, be aware of the conditions of probation. 'In such a case, knowledge of the criminal law is imputed to the probationer, as is an understanding that violation of the law will lead to the revocation of probation. On the other hand, where the proscribed acts are not criminal, due process mandates that the [defendant] cannot be subject to a forfeiture of his liberty for those acts unless he is given prior fair warning.'" *State v. Lewis*, 58 Conn. App. 153, 157, 752 A.2d 1144, 1146 (2000) (quoting *United States v. Dane,* 570 F.2d 840, 844 (9th Cir. 1977), *cert. denied*, 436 U.S. 959, 98 S. Ct. 3075, 57 L. Ed. 2d 1124 (1978)). *See also People v. Campos*, 198 Cal. App. 3d 917, 921, 244 Cal. Rptr. 75 (1988) ("It is implicit in every order granting probation that the defendant refrain from engaging in criminal practices."); *State v. Budgett*, 146 N.H. 135, 138, 769 A.2d 351, 353 (2001) ("It would be illogical and unreasonable to conclude that a defendant, who has been granted conditional liberty, needs to be given an express warning that if he commits a crime, he will lose the privilege of that liberty."); *State v. McGinnis*,

243 N.W.2d 583, 587-88 (Iowa 1976) ("Implicit in any probation is the condition the probationer shall not violate the law.").

Finally, Kentucky's alternative sentencing statute, KRS 533.020, specifically empowers the court to modify an alternative sentence if the defendant commits a criminal offense and clearly differentiates between violating a condition of the sentence and committing a criminal act.

For the foregoing reasons, the Taylor Circuit Court did not violate Brucker's due process rights when it revoked his probation.

## Conclusion

The Taylor Circuit Court's final judgment and sentence in 18-CR-00257-011 (No. 2019-CA-0864-MR) and its order revoking probation in 13-CR-00025-001 (No. 2019-CA-1403-MR) are hereby affirmed.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEFS FOR APPELLEE: |
|---|---|
| Molly Mattingly<br>Assistant Public Advocate<br>Frankfort, Kentucky | Daniel Cameron<br>Attorney General of Kentucky<br><br>Aspen Roberts<br>Assistant Attorney General<br>Frankfort, Kentucky |