**R.S., a Child Under Eighteen,**
**Appellant**

v.

**COMMONWEALTH of Kentucky,**
**Appellee.**

No. 2012–SC–000116–DG.

Supreme Court of Kentucky.

Feb. 20, 2014.

Jonathan Lee Wampler, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Marcia Lee Thomas, Special Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

Following hearings in juvenile session, a district court adjudicated R.S. a juvenile public offender, guilty of second-degree criminal mischief by complicity, and ordered him alone to pay the full amount of restitution to the victim. The charge against R.S. stemmed from an evening of teenage shenanigans, in which R.S. and a group of contemporaries used window paint to draw images of male genitalia and offensive messages on cars parked at a memorial service. One of the defaced cars was damaged in the incident by several scratches on the hood, doors, and quarter panels.

R.S. appealed this adjudication and restitution order first to the circuit court, which affirmed the district court's decision. He then appealed to the Court of Appeals. Finding sufficient evidence to support the district court's adjudication of guilt and no abuse of discretion by the district judge in ordering R.S. alone to pay full restitution, the Court of Appeals also affirmed the district court.

On discretionary review, we affirm the decisions of the lower courts. We hold that the Commonwealth presented sufficient evidence to support the adjudication of R.S.'s juvenile public offender status and that the district court may, in weighing the best interest of the child in a juvenile disposition, order one party to pay the entire amount of restitution.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

R.S., a teenaged child under 18 years of age, attended a memorial gathering for a friend. He and a group of friends then decided to write messages on each other's cars parked along the street at the memorial gathering. Initially, the messages were expressions of mourning. But, as the events unfolded, misbehavior escalated. The group of teens began writing on several cars parked at the memorial gathering. And, as the number of cars expanded, the messages changed from mourning to lewd drawings and words.

The victim emerged from the memorial gathering to find his car covered with these crude drawings and messages—so much so that on his way home, police initiated a traffic stop because the images covered the car's windows and mirrors, rendering visibility difficult and driving dangerous. The police officer allowed the victim to go without a citation because he was headed to a car wash to remove the drawings. Upon returning home, the victim and his mother noticed scratches on the hood, doors, and quarter panels of the car. Repair estimates indicated the scratches caused over $1,600 in damage to the car.

Local law enforcement began an investigation after receiving multiple reports of similar mischief on other vehicles. After taking a damage report from the victim, law enforcement officers received information regarding R.S.'s participation. R.S. admitted his involvement in painting the cars but denied any responsibility for or knowledge of the scratches on the victim's car. According to R.S., he drew only a single image on one window of the victim's car and then left the scene. A neighbor witnessed the teens defacing vehicles, even coming outside and exhorting them to stop the vandalism. The witness also saw a young man slide across the hood of the victim's car but was unable to positively identify R.S. as that same person.

Ultimately, R.S. was charged with and adjudicated a juvenile public offender guilty of complicity to commit second-degree criminal mischief. During the investigation, R.S. refused to provide the names

of his confederates but did reveal their names during the adjudicatory hearing. At that hearing, R.S. moved for a directed verdict[1] at the close of the Commonwealth's case; but the trial court denied the motion. The trial court found R.S. took affirmative action in the defacing of the vehicle, and the evidence was uncontroverted that the scratches occurred during that period. As a result, the trial court found sufficient evidence that R.S. was complicit in the causing of the scratches. And, despite being aware of others' involvement, the trial court ordered that R.S., alone, pay full restitution to the victim.

## II. ANALYSIS.

### A. There was Sufficient Evidence of Complicity to Commit Second–Degree Criminal Mischief to Adjudicate R.S. a Juvenile Public Offender.

Initially, R.S. urges this Court to overturn his adjudication because the Commonwealth produced insufficient evidence and, as a result, failed to meet its burden.[2] According to R.S., the Commonwealth was able only to produce a "perilously tenuous connection" between R.S.'s admitted involvement and the resultant damages. Although the evidence presented by the Commonwealth is light and mostly circumstantial, we agree with all three lower courts: the evidence is sufficient.

### 1. A Motion for Directed Verdict is Inapposite in Juvenile Adjudications.

█ We feel it important to begin by accenting the procedural and substantive uniqueness inherent in juvenile adjudications and their impact on our review. Juvenile proceedings are a distinct legal creature, involving aspects of criminal prosecution and civil practice. As a result, proper procedure and standards of review can be confusing. Today, we endeavor to provide a clearer guide for the bench and bar.

█ Generally speaking, there are two types of criminal adjudications in juvenile court: public offenders and youthful offenders. A *public offender* is a child who commits a "public offense which, if committed by an adult, would be a crime."[3] On the other hand, a *youthful offender* is "any person, regardless of age, transferred to Circuit Court ... and who is subsequently convicted in Circuit Court."[4] The procedures afforded and the affect of adjudication differs between the two types. Public offenders are not tried as adults and fall under the jurisdiction of district court.[5] But youthful offenders involve more serious crimes or recidivists and may be tried in circuit court as adults.[6] For the purposes of this case, we focus on the process involved with public offenders.[7]

Fundamentally, both the General Assembly and our case law make clear that for public offenders, "a juvenile adjudica-

1. We explain below why this type motion was inappositely made in a non-jury proceeding.

2. This argument is preserved for appellate review by trial counsel's motion at trial.

3. Kentucky Revised Statutes (KRS) 600.020(48).

4. KRS 600.020(67).

5. *See* KRS 635.020(1); KRS 610.010(3).

6. *See* KRS 635.020; KRS 640.010.

7. R.S. has neither previously been adjudicated a public offender for a felony offense nor been charged with any of the listed offenses for which youthful offender proceedings may be initiated. As a result, R.S. does not qualify for youthful offender status. *See* KRS 635.020; KRS 640.010.

tion is *not* tantamount to a criminal conviction, but rather, it is an adjudication of a status." [8] Bench trials, not particularly common in adult prosecutions, are mandatory in juvenile adjudications. Indeed, in "*[a]ll* cases involving children[,]" the adjudication "shall be dealt with *by the court without a jury.*" [9] In conducting the adjudication, the trial court is charged with "determin[ing] the truth or falsity of the allegations in the petition" based on the "admission or confession of the child ... or by the taking of evidence." [10] Of course, as a result of these proceedings involving an alleged violation of a criminal law, "[a]ll adjudications shall be supported by evidence beyond a reasonable doubt." [11]

■ At trial, R.S. moved the court for a directed verdict at the close of Commonwealth's evidence. But a directed verdict "is clearly improper in an action tried by a court without a jury." [12] Instead, "the appropriate procedural mechanism for early dismissal is found in CR 41.02(2)." [13] Under CR 41.02, a defendant may move for a dismissal on the ground that upon the facts and the law, the Commonwealth has not met its burden. The trial court, "as trier of the facts, may then determine them and render judgment against the [Commonwealth] or may decline to render any judgment until the close of all evidence." [14] The language of CR 41.02(2) makes clear the "considerations of a trial court on a motion to dismiss in a bench trial are quite different from those on a motion for directed verdict in a jury trial." [15] The trial court "must weigh and evaluate the evidence" rather than, with regard to directed verdict, "indulge every inference in the [Commonwealth's] favor." [16] Finally, if the trial court rules on the merits in favor of the defendant, factual findings must be made on the record.[17]

■ On appellate review of a ruling on a defendant's CR 41.02 motion, we will overturn the trial court only for an abuse of discretion.[18] An abuse of discretion will be found when the trial court's decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." [19] For a bench trial, we find this procedure to be more precise than a motion for a directed verdict, which addresses itself to a jury trial setting.

**8.** *Phelps v. Commonwealth,* 125 S.W.3d 237, 239 (Ky.2004) (emphasis added) (citing *Manns v. Commonwealth,* 80 S.W.3d 439, 445 (Ky.2002); *Coleman v. Staples,* 446 S.W.2d 557, 560 (Ky.1969)); *see also* KRS 635.040 ("No adjudication by a juvenile session of District Court shall be deemed a conviction, ... nor shall any child be found guilty or be deemed a criminal by reason of such adjudication.").

**9.** KRS 610.070(1) (emphasis added).

**10.** KRS 610.080(1).

**11.** KRS 610.080(2); *see also In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

**12.** *Brown v. Shelton,* 156 S.W.3d 319, 320 (Ky.App.2004).

**13.** *Id.* The Kentucky Rules of Civil Procedure (CR) are made applicable to criminal cases through Kentucky Rules of Criminal Procedure (RCr) 13.04.

**14.** CR 41.02(2).

**15.** *Morrison v. Trailmobile Trailers, Inc.,* 526 S.W.2d 822, 823 (Ky.1975).

**16.** *Id.* at 824.

**17.** CR 52.01.

**18.** *Jaroszewski v. Flege,* 297 S.W.3d 24, 31 (Ky.2009).

**19.** *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky.2000) (citing *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999)).

### 2. The Evidence Presented Against R.S. was Sufficient for any Trier of Fact to Adjudicate him a Juvenile Public Offender.

R.S. highlights various aspects of his adjudication as lacking in proof. First, R.S. argues that he did not have the specific intent to scratch the car; an element, he further argues, needed for a complicity conviction. And even if specific intent is not required, R.S. argues he did not act wantonly; and a conviction for complicity likewise fails. Finally, R.S. argues even if he acted wantonly or intentionally, he did not solicit or aid in the commission of the offense, nor did he refrain from exercising a legal duty to stop the conduct in question. As a result of these alleged short-comings, R.S. argues his status adjudication is flawed and should be overturned.

Complicity, as outlined in KRS 502.020, involves two separate and distinct methods of conviction. In our view, R.S.'s argument that the Commonwealth did not sufficiently prove he possessed the specific intent to scratch the vehicle, misses the mark. In *Tharp v. Commonwealth,*[20] the available methods of conviction for complicity under KRS 502.020(*l*)-(2) were thoroughly discussed. *Tharp* notes that there are "two separate and distinct theories under which a person can be found guilty by complicity."[21] Outlined under section (1) and (2) of KRS 502.020, these theories have come to be known as "complicity to the act" and "complicity to the result," respectively. "Complicity to the act" requires a person to act "with the *intention* of promoting or facilitating the commission of the offense"[22] and is applicable to situations where "the principal's *conduct* constitutes the criminal offense."[23] On the other hand, "complicity to the result" only requires a person to act "with the kind of culpability with respect to the result that is sufficient for commission of the offense."[24] "Complicity to the result" applies when "the *result* of the principal's conduct constitutes the criminal offense."[25]

The *Tharp* court plainly detailed the distinction between the two theories:

> [A] person can be guilty of "complicity to the act" under KRS 502.020(1) only if he/she possesses the *intent* that the principal actor committed the criminal act. However, a person can be guilty of "complicity to the result" under KRS 502.020(2) without the intent that the principal's act cause the criminal result, but with a state of mind which equates with "the kind of culpability with respect to the result that is sufficient for the commission of the offense," whether intent, recklessness, wantonness, or aggravated wantonness.[26]

Importantly, under "complicity to the result," an "accomplice's liability and the principal actor's liability can be at different levels."[27] And "proof that another caused the prohibited result is all that is required."[28] Indeed, "only the defendant/accomplice's mental state is at issue."[29] The

---

20. 40 S.W.3d 356 (Ky.2000).

21. *Id.* at 360.

22. KRS 502.020(1) (emphasis added).

23. *Tharp,* 40 S.W.3d at 360.

24. KRS 502.020(2) (emphasis added).

25. *Tharp,* 40 S.W.3d at 360.

26. *Id.*

27. *Harper v. Commonwealth,* 43 S.W.3d 261, 267 (Ky.2001).

28. *Id.*

29. *Id.*

mental state of the principal or any other actor participating in the events leading to the criminally-sanctioned result is immaterial. Moreover, the Commonwealth is not required to prove the identity of the principal. And, of course, the Commonwealth is certainly not required to prove R.S. personally scratched the car.[30]

 Second-degree criminal mischief dictates the defendant must be shown to have acted intentionally or wantonly in defacing, damaging, or destroying any property and causing a pecuniary loss of $500 or more.[31] Criminal mischief is a "result" crime. That is, as mentioned previously, the punishment is for the result of particular conduct rather than the conduct itself. In the case of criminal mischief, the prohibited result is pecuniary loss of $500 or more. Accordingly, to find a defendant guilty of complicity to commit second-degree criminal mischief, "complicity to the result" under KRS 502.020(2) must be applied.

 Complicity to commit second-degree criminal mischief for R.S. would require proof: (1) that another person, regardless of whether his identity is known, scratched the vehicle; (2) that R.S. actively participated in the unknown principal's actions that resulted in the scratches by soliciting, aiding, or shirking a legal duty to prevent the damage [32]; and (3) that R.S. acted intentionally or wantonly.[33]

 Simply put, specific intent, which R.S. contends is absent, is *not* required for guilt under "complicity to the result." The absence of evidence of specific intent, despite R.S.'s assertion to the contrary, is not an error in the adjudication. Moreover, "complicity to the result" does not require "evidence of an express pact between the complicitors. Rather, just as the defendant's state of mind may be inferred from the circumstances, we have held that circumstantial evidence of complicity may suffice." [34]

 At the adjudicatory hearing, the Commonwealth put on proof that R.S. was at the scene and actively involved in the group's actions. R.S. admitted to law enforcement that he was involved with the group that night and drew on the victim's

---

30. When adjudicating R.S., the trial court stated the evidence was insufficient to find R.S. personally liable. R.S. alludes to this statement several times in his brief. But the statement is a distraction. It is inconsequential to a conviction for complicity whether it is possible to convict the defendant as the principal. Indeed, proof that the defendant was the principal is *not* an element of the offense. The trial judge's statement cannot bear the weight R.S. attempts to give it.

31. KRS 512.030.

32. KRS 502.020(2) requires proof that a defendant:
 (a) Solicit[ed] or engag[ed] in a conspiracy with another person to engage in the conduct causing such result; or
 (b) Aid[ed], counsel[ed], or attempt[ed] to aid another person in planning, or engaging in the conduct causing such result; or
 (c) [Had] a legal duty to prevent the conduct causing the result, [but] fail[ed] to make a proper effort to do so.

33. Because intent is a commonly understood mental state and not relevant for R.S.'s adjudication of guilt, we do not find it useful to provide a legal definition here. A person acts *wantonly* "with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." KRS 501.020(3). Further, "[t]he risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*

34. *Peacher v. Commonwealth*, 391 S.W.3d 821, 841–42 (Ky.2013).

car.[35] A neighbor who lived near the location where the victim's car was parked testified that a car parked in front of her home and several boys and girls got out of the car. The group of teenagers walked up to the victim's car and began drawing on the car. At some point during the night, the neighbor went outside and admonished the group to stop. And, as the neighbor watched, a boy in the group slid across the hood of the car. The neighbor was unable to identify R.S. as a member of the group or as the boy who slid across the hood but did recognize other members of the group.

 We do not disagree with R.S. that the evidence offered against him is thin. But our review is not whether the evidence against R.S. is perfect or the best possible. Instead, our review is limited to whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements beyond a reasonable doubt."[36] While, historically, this standard has applied to criminal convictions, we believe it appropriate to apply it to juvenile adjudications because the classic beyond-a-reasonable-doubt standard must be met. Of course, as previously discussed, juvenile adjudications are not treated as criminal convictions; but this does not alter the necessary burden of proof for the Commonwealth. It is not within the province of this Court to substitute our judgment for the trial court's. The opportunity to view witnesses testify and observe their demeanor, as well as weighing their credibility, cannot be over-

stated. Accordingly, we do not reexamine the evidence but only the trial court's decision *in light of* the evidence.

Here, the evidence produced by the Commonwealth was more than sufficient. The evidence is substantial, albeit circumstantial. R.S. admits to being at the scene and actively participating in the group's conduct. To find R.S. actively participated but that he did not, for purposes of complicity, aid in causing the result of the mischief would be illogical. Certainly, "any rational trier of fact" could find the elements of complicity to commit criminal mischief proven beyond a reasonable doubt.

We have no misgivings about the district court's finding that R.S. acted wantonly during the defacing of the victim's vehicle. It is not simply the writing on the victim's car that creates the substantial risk but, rather, the circumstances under which the writing took place. Admittedly, window paint is seemingly harmless to a car's exterior when properly applied. By willingly agreeing to engage in this conduct with his classmates and actively participating, R.S. ignored the substantial risk that the car would be damaged. As we have repeatedly held, because "a person is presumed to intend the logical and probable consequences of his actions[,]" his "state of mind may be inferred from actions preceding and following the charged offense."[37] Here, the evidence supports the presumption that R.S. was aware that damage to the car was a probable consequence of the action and, through his willing partic-

---

**35.** As an aside, it is simply immaterial that the sole evidence placing R.S. at the scene is his own admission. The admission of a defendant is treated as any other evidence entered into the record. The judge weighs the credibility of that evidence and issues a ruling based on that evidence. Evidence is not insufficient or viewed skeptically simply be-

cause the Commonwealth relies on a defendant's admission to place him at the scene of the crime.

**36.** *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**37.** *Harper*, 43 S.W.3d at 265.

ipation, ignored that risk. Given the evidence, we can infer R.S. acted wantonly. The trial court did not act erroneously in finding, beyond a reasonable doubt, that R.S. was complicit in the criminal mischief.

The Commonwealth presented proof that the scratches occurred and offered an explanation for how they occurred. The evidence is uncontroverted that R.S. participated in the activities leading to the car damage. We do not believe the trial court was clearly erroneous in its fact finding so we do not set them aside. And the facts clearly indicate R.S.'s active participation in the activity leading to the damage at issue. As such, sufficient proof exists for R.S.'s adjudication.

## B. Ordering Restitution be Paid by a Single Juvenile Accomplice is Within the Discretion of the Trial Court.

Additionally, R.S. challenges the trial court's decision to require R.S. to pay full restitution without apportionment among the other teens allegedly involved. R.S. argues that the trial court violated his due process rights and acted contrary to the purpose of the Juvenile Code. Furthermore, R.S. contends the trial court erred in failing to hold a sufficient restitution hearing or make findings regarding restitution. Because R.S. failed to object at the restitution hearing, this error is unpreserved and will only be reviewed for palpable error.[38]

We only review an unpreserved error if the "error affects the substantial rights of a party" and is, indeed, "palpable." [39] And the substantial rights of a party are only affected "if it is more likely than ordinary error to have affected the judgment." [40] If an error is clear and plain under current law, it rises to the level of palpable.[41] But, even if the error *is* palpable, relief will only be afforded "upon a determination that manifest injustice has resulted from the error." [42] Appropriately so, manifest injustice is a significant burden. Error casts a shadow of injustice; but this injustice becomes *manifest* only when it "so seriously affect[s] the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.' " [43]

Under Kentucky law, restitution is intended as a "system designed to restore property or the value thereof to the victim." [44] Restitution is *not* intended to be additional punishment for the defendant. In the adult context, KRS 533.030(3) states that "[w]here there is more than one (1) defendant or more than one (1) victim, restitution *may* be apportioned." [45] We are unable to find a published case on the meaning of "may be apportioned" and whether it allows for joint and several liability with regard to restitution. But, in *Burton v. Commonwealth*,[46] an unpublished decision, the

---

38. Kentucky Rules of Criminal Procedure (RCr) 10.26.

39. *Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky.2009); *see also* RCr 10.26.

40. *Jones*, 283 S.W.3d at 668.

41. *Id.* (citations omitted).

42. *Id.*

43. *Id.* (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky.2006)).

44. *Commonwealth v. Bailey*, 721 S.W.2d 706, 707 (Ky.1986).

45. (Emphasis added).

46. 2005 WL 195079 (No.2003–CA–001076) (Ky.App. Jan. 28, 2005). Citation of this case satisfies the exception to CR 76.28's general prohibition of citing unpublished decisions as the decision was rendered after January 1, 2003; and "there is no published opinion that would adequately address the issue before the court."

Court of Appeals interpreted the adult restitution statute plainly to allow a trial court to order joint and several liability for only a single defendant. Apportionment among defendants is *not* mandatory. In fact, the General Assembly equipped trial courts with discretion regarding when apportionment may, or may not be, appropriate. And ordering a defendant to pay full restitution despite the court's awareness of others' involvement does not frustrate the purpose of restitution because the purpose is to restore to the victim what was lost as a result of the criminal activity. We agree with the reasoning from *Burton* and now seek to apply it to juvenile adjudications.

Having already highlighted the structural differences between adult prosecutions and juvenile adjudications, we now discuss their divergent purposes. The Juvenile Code was created with an eye toward rehabilitation rather than retribution. Indeed, the stated purpose of the Juvenile Code is "rehabilitating juvenile offenders, when feasible, as opposed to the primarily punitive nature of the adult penal code."[47] And "[a]ny child brought before the court . . . shall have a right to treatment reasonably calculated to bring about an improvement of his or her conviction."[48] No such right exists for adults. While there is certainly a thread of rehabilitation present in holding an individual accountable for his actions, the best interest of an adult is not a factor for consideration by the judge or jury in adult prosecutions. Furthermore, the Juvenile Code explicitly strives to "reduce recidivism and assist in making the child a productive citizen."[49]

Notably, KRS 635.060, the statute outlining the disposition options for a trial court in juvenile adjudications, uses similarly permissive language to KRS 533.030. Included in the listed disposition options is restitution. At the dispositional hearing, the trial court "*may:* [o]rder the child or his parents, guardian, or person exercising custodial control to make restitution or reparation to any injured person *to the extent, in the sum and upon the conditions as the court determines.*"[50] Importantly, the statute plainly uses the permissive "may." We are quick to emphasize—lest we appear to countenance unfettered discretion—that in any juvenile disposition, the trial court "shall act in the best interest of" the child.[51]

Through its enactment of KRS 635.060, the General Assembly granted the trial court broad authority to create a restitution program to fit the situation and accomplish the stated purposes of the Juvenile Code. While there is no explicit mention of apportionment in either the permissive or mandatory sense, the extensive grant of authority to the trial court is clear. It strains common sense to read KRS 635.060 to prohibit the form of restitution ordered in this case. Of course, the language used in KRS 635.060 is different than that used in KRS 533.030; but the overall effect remains the same. We see no reason not to apply the reasoning from *Burton*, an adult criminal case, to R.S.'s case, despite its juvenile-session setting. Accordingly, a trial court may order a single complicitor to pay full restitution despite knowing other complicitors exist.

Further, the argument that the form of restitution ordered in this case runs contrary to the purpose of the Juve-

47. *Phelps v. Commonwealth,* 125 S.W.3d 237, 240 (Ky.2004).

48. KRS 600.010(2)(d).

49. KRS 600.010(2)(e).

50. KRS 635.060 (emphasis added).

51. KRS 610.110(1) (emphasis added).

nile Code is meritless. First, vesting the trial court sitting in juvenile session with broad discretion to set appropriate punishment promotes rehabilitation because it allows the creation of a bespoke punishment, perfectly tailored for the particular case *and* child before the court. Second, restitution, even in the form presented here, *promotes* the purposes of the Juvenile Code. Various studies have proven restitution to be successful at lowering juvenile recidivism rates, especially among first-time offenders.[52] And, restitution certainly promotes the principles of "personal responsibility, accountability, and reformation." [53] We see no reason why the instant restitution would somehow fail to instill these desired virtues in a juvenile offender, similarly situated to R.S.

Finally, KRS 635.060(1)—in conjunction with KRS 600.010(1)—dictates a trial court hold a restitution hearing and make findings that restitution, in whatever form the trial court orders, serves the best interest of the child. We are sympathetic to the difficult circumstances facing trial courts in juvenile cases. In an attempt to alleviate future confusion regarding restitution, we offer guidance to trial courts on proper procedure and considerations when entering an order of restitution. Of course, the best interest of the child is paramount. A trial court, in ordering restitution—presumably in the best interest of the child—should make findings of *why* restitution promotes the child's best interest. Oral findings on the record when entering a restitution order are sufficient. Unfortunately, the General Assembly has provided little aid to determine properly if restitution is indeed in the best interest of the child.

In addition to any other evidence presented by the child, we recommend the trial court take into account various factors relating to the child's circumstances in reaching the decision to order restitution. These factors include, but are not limited to: the age of the child, the earning ability of the child or ability to pay, the employment status of the child, the ability of the child's parents or guardians to pay, the amount of damage to the victim, and any legal remedies available to the victim.[54] The amount of restitution should be reasonable, balanced between making the victim whole and the child's ability to pay. If the restitution amount is unreasonable, the trial court runs the risk of frustrating and embittering the child and negating any potential chance for reform.[55]

Here, the restitution hearing was severely lacking in substance; and the trial court's findings were akin to a rubber-stamp of the Department of Juvenile Justice (DJJ) recommendation. The trial court should have made findings on the record why ordering complete and sole restitution would be in R.S.'s best interest *before* entering the restitution order. While the instant trial court's procedure is not the practice we promote today, it does not constitute manifest injustice. We are unable to determine how, even in light of our reasoning today, R.S.'s substantial rights were affected or how the proceeding

52. *See, e.g.,* Sudipto Roy, *Juvenile Restitution and Recidivism in a Midwestern County,* 59 Fed. Probation 55 (March 1995).

53. KRS 600.010(2)(e).

54. *See In re K.G.,* 369 Mont. 375, 298 P.3d 1151, 1154 (2013); *In re Laurance S.,* 274 Neb. 620, 742 N.W.2d 484, 488 (2007); *State v. Kristopher G.,* 201 W.Va. 703, 500 S.E.2d 519 (1997).

55. *See State v. M.D.J.,* 169 W.Va. 568, 289 S.E.2d 191, 196 (1982).

below could be labeled shocking or juris-prudentially intolerable. Indeed, the proceeding was quite tolerable. The form of restitution presented here may very well be in the best interest of R.S., advancing the principles of "personal responsibility, accountability, and reformation."[56] We affirm the decision of the Court of Appeals.

### III. CONCLUSION.

For the reasons set forth above, we affirm the decision of the Court of Appeals affirming R.S.'s adjudication as a juvenile public offender. And we find appropriate the trial court's disposition order mandating R.S. to pay the entire amount of the victim's damages, other individuals' possible involvement in the acts of vandalism notwithstanding.

All sitting. ABRAMSON, CUNNINGHAM, KELLER, SCOTT, and VENTERS, JJ., concur. NOBLE, J., concurs in result only.