# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: AUGUST 18, 2022
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0113-MR

DAMOU BRADLEY                                                       APPELLANT

V.                ON APPEAL FROM SCOTT CIRCUIT COURT
HONORABLE JEREMY MATTOX, JUDGE
NO. 20-CR-00080

COMMONWEALTH OF KENTUCKY                             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Damou Bradley was tried and convicted of second-degree assault and attempted murder after a bench trial in Scott Circuit Court. He was sentenced to twenty years in prison, and now appeals as a matter of right. Bradley argues that the trial court erred by denying his motion for directed verdict, which Bradley should have presented as a motion to dismiss pursuant to Kentucky Rule of Civil Procedure (CR) 41.02(2), and erred by admitting evidence of other bad acts under Kentucky Rule of Evidence (KRE) 404(b). After review, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

Damou Bradley and the victim, D.B.,[1] met through a dating website in August 2016. Their relationship began with text messages and phone calls and progressed to meeting in person. In October 2016, their relationship became sexual. However, in late January 2017, Bradley and D.B. decided to only be friends and continued to spend time together. Bradley testified that he told D.B. he did not think they were romantically compatible. Their relationship did not change much, other than no longer being intimate with each other. D.B. recalled that they still spoke every day, listened to music together, went hiking, and occasionally spent the night together.

On the morning of May 13, 2017, D.B. went to work. As she arrived at work, Bradley texted her stating that he stole her credit card information and also making unusual statements about faith as well as comments about being Jesus. That afternoon D.B. received an unsettling phone call from her close friend, Nate, who was in the process of moving in with her. Nate was at D.B.'s apartment putting furniture together for his upcoming move. Bradley was also there. During Nate's phone call to D.B., Nate seemed afraid and alerted D.B. that Bradley attempted to attack and stab him. Nate was able to run out of the house when the attempted attack occurred.

Concerned about Bradley's behavior and confused about the altercation, D.B. left work and drove straight home. Upon arriving, D.B. asked Bradley

---

[1] We use the victim's initials to protect her identity.

what happened. Bradley was evasive and asserted he had gotten his knife out to help assemble furniture because Nate did not have a screwdriver. D.B. also testified that during this conversation Bradley rambled about faith, reincarnation, and the Bible. Bradley never gave a direct answer as to why he tried to attack Nate and attempted to shift the blame to Nate. In response to Bradley's persistent attempt to place blame on Nate, D.B. explained to Bradley that if she had to choose between Bradley and Nate, she would choose Nate. D.B. started to cry and became afraid, recognizing the situation was strange and concerning. Eventually, Bradley appeared to calm down and their conversation became normal. To continue her usual routine, D.B. decided to take a shower.

Realizing her soap and shampoo were not in the shower where she left them, D.B. called out to Bradley to bring her the items.[2] At first, Bradley was apprehensive to enter the bathroom and simply set the bottles on the sink. However, he then asked if he could get in the shower with her, which she found odd because they had never showered together before. While apprehensive, she acquiesced to keep him calm. Shortly after entering the shower Bradley stated he had to use the restroom and left. When he got back into the shower, he kissed D.B. aggressively and asked her to perform oral sex. She told him she did not want to, but he insisted so she acquiesced.

---

[2] D.B. testified that the missing shampoo and soap was odd because she did not remove those items from her shower. The insinuation was that Bradley removed the items from the shower as part of his planned attack on D.B. In the final judgment, the trial court referenced Bradley's "staging" of the shower by removing the toiletries.

3

After D.B. performed oral sex for approximately one minute, Bradley grabbed her hair and shoved her head down, choking her. Bradley then yanked on her hair, shoved her down onto the bathtub floor and began punching her on her back and shoulder. She screamed at him to let her up and she tried to punch his legs to get free. Bradley grabbed her head and hair, flipped her over and put one hand around her neck. D.B. felt a jab in her side and thought Bradley used a razor to cut her. However, when Bradley raised his hand, she saw Bradley's knife in his hand and realized he brought it into the shower.[3]

As D.B. begged Bradley to stop, Bradley stated that God told him to kill her. After stabbing D.B. in her side, Bradley stabbed her on the left side of her neck around her collarbone, then in the front of her neck, and finally on the back, right side of her neck. After the final stab, Bradley sat the knife on the edge of the bathtub and D.B. flung it away. Bradley grabbed D.B.'s neck with both hands and applied "incredible force" as he strangled her. Despite her efforts she could not get away from him. She could not breathe and testified that within 30 to 45 seconds she passed out.

When D.B. passed out, Bradley thought she was dead. He closed the shower curtain, turned out the light, and left the bathroom. Bradley started gathering his belongings, went downstairs and stepped outside, trying to calm

---

[3] D.B. had seen Bradley's knife before because Bradley frequently carried it with him, allegedly for his protection. According to D.B., Bradley previously made the comment that "real men use knives."

4

himself down. He went back inside to retrieve his video game console. As he went upstairs, he heard wheezing and coughing from the bathroom.

D.B. testified that as she regained consciousness, she had difficulty breathing. She had toilet paper shoved in her mouth and black shorts were wrapped around her neck. As she opened her eyes, she noticed the room was dark and realized the shower curtain was closed. She remained still and focused on her breathing.

She heard Bradley come upstairs. He entered the bathroom and turned on the light. According to D.B., he opened the shower curtain and exclaimed, "Oh my god, you're alive? That should have killed you . . . I watched you die, and you're back." She was still at the bottom of the bathtub and struggling to breathe. D.B. realized she was covered in blood. Bradley offered to clean D.B. up and they proceeded to the other bathroom in the apartment. Bradley restated that God told him to kill her, and again proclaimed that he watched D.B. die and called her a sacrifice. Bradley then inexplicably started calling D.B. God. D.B. eventually convinced Bradley to call 911.

Bradley called 911 and admitted to the operator that he stabbed his girlfriend. He was not clear in describing her condition, so she took the phone and spoke with the operator. Police officers arrived and paramedics began treating D.B.

Bradley testified at trial and recounted a different version of the events. He testified that Nate, D.B.'s soon-to-be roommate, came to D.B.'s house to assemble furniture. Nate did not have a screwdriver, so Bradley tossed his

5

knife over by Nate's feet. This seemed to startle Nate, so he tossed the knife back to Bradley and left. D.B. came home early from work and told Bradley that she wanted an exclusive relationship with him. Bradley told her he was not interested, which upset D.B.

D.B then got into the shower alone. She was taking longer than usual, so Bradley went to check on her. He knocked on the door but got no response. He cracked the door open and could see D.B.'s body slumped in the shower through the reflection in the mirror. He thought she was dead because the shower was covered in blood. Bradley pulled back the curtain and called D.B.'s name with no response. He grabbed a pair of shorts and tried to stop the bleeding. Convinced she was dead, Bradley turned off the lights and left the bathroom because he did not like seeing her in that state. He could not call 911 because his phone was dead. He began to panic and started to pack his things. He stepped outside for some air and when he came back in the house, he heard D.B. coughing.

After finding D.B. alive, he tried to help her, but she refused his help. He got peroxide and paper towels for her injuries, but he could not stop the bleeding. D.B. finally let Bradley help her out of the shower and he noticed she had trouble breathing. Bradley used D.B.'s phone to call 911. Bradley initially did not want to call 911, but D.B. proposed that Bradley state that he attacked her and claim to be schizophrenic as an explanation for the attack. D.B. told Bradley that she had more to lose and that she would be fired from her job if they learned she attempted suicide. At this point, Bradley believed D.B.'s

6

injuries were self-inflicted. Bradley agreed to go along with D.B.'s plan and the police arrived shortly thereafter. Bradley's testimony was the only evidence to support his theory. During trial, he denied choking D.B. and testified that he was badgered into a confession by law enforcement.

After police read Bradley his rights, they questioned him. Bradley told an officer multiple times that he stabbed and choked D.B. When asked for an explanation, Bradley explained that he had been thinking about harming D.B. for about a week, and that it was a big decision because he had never taken a life before. Bradley explained that God instructed him to do it as a test of his faith. In the videotaped police interview, which was admitted as a trial exhibit, Bradley stated that he attacked D.B. with his knife, confirmed that he stabbed her first, then choked her, and stated "it's not like I even stabbed her hard, I just stabbed her."

During a search of the apartment police found the knife Bradley used to stab D.B. The knife is a deadly weapon as defined by Kentucky Revised Statute (KRS) 500.080(4)(c). Forensic testing confirmed the presence of both Bradley's and D.B.'s DNA on the knife and D.B.'s testimony also confirmed that it was the knife used to stab her. Police also found Bradley's backpack, which contained bleach, peroxide, a trash bag, black Gorilla tape, clothes, and a sock full of coins that was tied up at the end. D.B. suffered injuries to her throat, neck, and the right side of her abdomen as a result of the stabbing.

Bradley was charged with attempted murder and first-degree assault on July 6, 2017. On March 13, 2020, a superseding indictment charged Bradley

7

with second-degree assault and attempted murder. A bench trial began on November 16, 2020. At trial, Bradley's defense was that D.B. stabbed herself. Bradley asserted that D.B. concocted a plan for Bradley to take the blame by claiming that he suffered from a paranoid-schizophrenic delusion that God told him to kill her. Bradley also claimed that D.B. was upset because he had recently rejected her request to be in an exclusive relationship. Ultimately, the trial court found Bradley guilty of both second-degree assault and attempted murder and sentenced him to twenty years in prison.

## ANALYSIS

### I. The Trial Court Properly Denied Bradley's Motion for Directed Verdict.

Bradley argues that the Commonwealth failed to prove all elements of attempted murder. Bradley made a motion for directed verdict at the close of the Commonwealth's proof and a second motion at the close of all the evidence. The trial court denied both motions. However, since this was a bench trial, the trial court should have treated both of Bradley's motions as motions to dismiss under CR 41.02(2), which states:

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

Under this rule, "[t]he trial court 'must weigh and evaluate the evidence' rather than, with regard to directed verdict, 'indulge every inference in the

8

[Commonwealth's] favor.'" *R.S. v. Commonwealth*, 423 S.W.3d 178, 184 (Ky. 2014) (quoting *Morrison v. Trailmobile Trailers, Inc.*, 526 S.W.2d 822, 824 (Ky. 1975)).  A trial court's ruling under CR 41.02(2) is reviewed for an abuse of discretion.  *Id.* (citing *Jaroszewski v. Flege*, 297 S.W.3d 24, 31 (Ky. 2009)).  The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

The Commonwealth asserts that this alleged error is subject only to palpable error review because Bradley did not make a proper motion pursuant to CR 41.02 at trial.  The Commonwealth cites *Early v. Commonwealth*, 470 S.W.3d 729, 733 (Ky. 2015), to argue that "[i]nsufficiently specific motions, such as moving summarily for a directed verdict or making a general assertion of insufficient evidence, are not enough to satisfy the specificity requirement."[4] To preserve an error for appeal, a motion "must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove." *Id.* (quotation and citation omitted).  However, this Court has reviewed alleged errors regarding CR 41.02 that were improperly characterized as motions for directed verdict at trial according to our ordinary standard of review for CR 41.02 motions.  *See R.S.*, 423 S.W.3d at 184.  In any

---

[4] At trial, defense counsel stated as follows: "Your Honor, at this time we move the Court for a directed verdict in that the Commonwealth through their case has failed to prove each and every element of the assault-second charge and criminal attempt to commit murder."

The second motion reflected the original motion.  We need not determine whether these motions met the specificity requirement because we find no error.

event, although Bradley used the wrong procedural method at trial, it has no bearing on our ultimate resolution of this issue given the overwhelming evidence against Bradley.

Bradley argues that to be convicted of attempted murder, the trial court must have concluded that he specifically intended to kill D.B. during the attack and took a substantial step to do so. The trial court concluded that the choking constituted the substantial step necessary for the attempted murder conviction. He asserts that the evidence did not indicate he intended to kill D.B. and that D.B. did not suffer life threatening injuries from being choked.

KRS 506.010 states:

(1) A person is guilty of criminal attempt to commit a crime when, acting with the kind of culpability otherwise required for commission of the crime, he:

    (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

    (b) Intentionally does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime.

(2) Conduct shall not be held to constitute a substantial step under subsection (1)(b) unless it is an act or omission which leaves no reasonable doubt as to the defendant's intention to commit the crime which he is charged with attempting.

"A person is guilty of attempted murder when, with the intent to kill someone, he takes a substantial step toward killing him." *Perry v. Commonwealth*, 839 S.W.2d 268, 273 (Ky. 1992) (citing KRS 506.010(1)(b); KRS 507.020). Intent to kill may be inferred from the crime itself and the circumstances surrounding

10

the act.  *Craft v. Commonwealth*, 483 S.W.3d 837, 842 (Ky. 2016) (citation omitted).

The trial court concluded that Bradley had the requisite intent to cause the death of D.B.  The trial court cited extensive evidence to support this conclusion, including: (1) Bradley's admissions to the 911 operator and law enforcement; (2) D.B.'s testimony regarding the attack, namely that when she asked Bradley what he was doing, he replied, "God told me to kill you"; Bradley stuffing toilet paper in her mouth and wrapping her shorts around her neck, and him stating "that should have killed you . . . I watched you die;" (3) the medical evidence concluding D.B. was choked, sustained bruising, and lost consciousness; (4) Bradley's text messages to D.B. earlier on the day of the attack that included stating, "Im jesus Christ and I never knew how this really felt to know the truth of manifestation," and stating he was "ready for [his] next phase already im ok with what has to happen in my life," messages the trial court believed indicated Bradley's plan to blame the attack on God; (5) the items Bradley brought to D.B.'s residence in his backpack, which included bleach, a trash bag, a sock with lots of coins inside and tied at one end, a roll of Gorilla tape, and a change of clothes; and (6) Bradley's explanation to police that he contemplated the attack for a week and that it was a big decision because he had never taken a life before.

The trial court clearly weighed and evaluated the evidence presented. *R.S.*, 423 S.W.3d at 184.  That evidence was sufficient to meet the Commonwealth's burden.  Although in denying Bradley's motion for directed

11

verdict the trial court announced that it viewed the evidence in the light most favorable to the Commonwealth, the evidence against Bradley was overwhelming without regard to how it was viewed, i.e., even without viewing it in the "light most favorable to the Commonwealth" the result was inescapable. As such, Bradley was not entitled to dismissal under CR 41.02(2) and the trial court did not abuse its discretion.

## II. The Trial Court Properly Admitted Evidence Under KRE 404(b).

At trial, D.B. testified regarding two other instances of Bradley's unrelated criminal activity or bad acts. D.B. first alleged that Bradley stole her credit card information and admitted to doing so with the intent of stealing from her. Next, D.B. claimed Bradley sexually assaulted her in the shower by choking her on his penis immediately before the stabbing incident. Bradley argues that this testimony about forcible oral sex, which amounts to sodomy, was exacerbated by continued references to a sexual assault kit, which did not contain Bradley's DNA. Bradley argues that the admission of D.B.'s testimony regarding these instances was error.

This alleged error is not preserved for review. Therefore, we review Bradley's claim for palpable error pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26. That rule states:

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

Under palpable error review, "if upon a consideration of the whole case this court does not believe there is a substantial possibility that the result would have been any different," then relief is not warranted. *Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky. 2003).

> KRE 404(b) provides in relevant part:
>
> Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> > (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> >
> > (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

A three-part test for assessing the admissibility of other bad acts evidence under KRE 404(b) was outlined in *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994), and includes analysis of the relevance, probativeness, and prejudice associated with the evidence of the prior bad act.

"Evidence of similar acts perpetrated against the same victim . . . is almost always admissible, under KRE 404(b), because it will almost always be significantly probative of a material issue aside from the defendant's character." *Jenkins v. Commonwealth*, 496 S.W.3d 435, 458 (Ky. 2016) (internal quotations and citations omitted). This evidence is not automatically

13

admissible and must be examined under *Bell*. *Id.* at 457 (citing *Bell*, 875 S.W.2d at 890).

The evidence of Bradley's sexual assault of D.B. in the shower is clearly relevant to the relationship between D.B. and Bradley and the events that transpired. "Evidence which is not relevant is not admissible." KRE 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. The trial centered around the relationship between D.B. and Bradley which culminated in the May 13, 2017 attack. Further, the sexual assault immediately preceded the stabbing and choking.

The Commonwealth "is permitted to present a complete, unfragmented picture of the crime and investigation . . . ." *Howard v. Commonwealth*, 595 S.W.3d 462, 480 (Ky. 2020). The sexual assault evidence was part of the continuing attack on D.B. and is reasonably related to Bradley's intent, plan, or opportunity to attack D.B. KRE 404(b)(1). The relation to the continuing attack also renders this testimony probative because it provided context to the circumstances surrounding the attack. "The fact that the victim and the date of the crimes were the same, the crimes were related in nature, and the crimes were part of a continuing course of conduct, raises reasonable inferences bearing on motive, opportunity, intent and common plan or scheme." *Roberson v. Commonwealth*, 913 S.W.2d 310, 316 (Ky. 1994), *overruled on other grounds, abrogation recognized by Parks v. Commonwealth*, 89 S.W.3d 395 (Ky. 2002).

14

Because the sexual assault was part of an uninterrupted series of violent and aggressive acts toward D.B., the trial court properly admitted the testimony. Additionally, the references to the sexual assault kit were fleeting, brief, and merely provided during testimony about evidence collection.

Bradley also argues that D.B.'s allegation that Bradley stole her credit card information and admitted to doing so was not relevant or probative and was unfairly prejudicial because it impacted Bradley's credibility with the trial court. D.B.'s testimony regarding the stolen credit card information lasted approximately seven seconds. After stating that Bradley admitted to stealing her credit card information and admitted his intent to steal from her via text message, she immediately began discussing the other strange messages she received from Bradley that day. The text messages Bradley sent earlier in the day of the attack contained strange references, including Bradley stating that he had D.B.'s credit card information deleted because he sent it to his God, and a message claiming he was Jesus Christ.

Overall, the reference to the stolen credit card information was fleeting, especially considering the other testimony D.B. provided about her relationship with Bradley and the attack. Contrary to Bradley's claims, the evidence was not unfairly prejudicial. "Evidence is unfairly prejudicial if it will induce the [factfinder] to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Brown v. Commonwealth*, 313 S.W.3d 577, 619 (Ky. 2010). Here, the trial court decided the case on the overwhelming evidence that Bradley assaulted D.B. and attempted to murder

15

her, not on any improper basis. The evidence of Bradley's "other acts" was relevant, probative, and not unfairly prejudicial. As such, the testimony was admissible and no error occurred.

Even if the admission of the KRE 404(b) testimony was somehow improper, reversal is not warranted because of the overwhelming evidence against Bradley. Since this claim of error is unpreserved, Bradley must show that the exclusion of the other acts evidence would have changed the outcome of the trial, which he cannot possibly do on the record before us. We cannot find a "substantial possibility that the result would have been any different" without the evidence of Bradley choking D.B. with his penis immediately preceding the attack, references to the sexual assault kit, or references to the stolen credit card information. *Schoenbachler,* 95 S.W.3d at 836. In short, even if admission of the evidence was improper, no "manifest injustice" resulted from the error. RCr 10.26.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the Scott Circuit Court.

All sitting. All concur.

16

COUNSEL FOR APPELLANT:

Kayla Danielle Deatherage
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General