# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: JUNE 13, 2019
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000669-TG
2018-SC-000020-MR
2018-SC-000309-MR

JOHN PEARSON                                        APPELLANT

V.
          ON APPEAL FROM KENTON CIRCUIT COURT
          HONORABLE GREGORY M. BARTLETT, JUDGE
          NO. 15-CR-00857 & 15-CR-000857-001

COMMONWEALTH OF KENTUCKY                    APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A circuit court jury found John Pearson[1] guilty of first-degree burglary, second-degree arson, being a first-degree persistent felony offender, and possession of a firearm by a convicted felon, all for which John received a total sentence of 35 years' imprisonment. John now appeals the resulting judgment as a matter of right,[2] raising four issues for review. Finding no reversible error, we affirm the entirety of the judgment.

---

[1] We refer to the defendant as "John" because his brother, James Pearson, was a co-defendant in their joint trial. We affirmed the trial court's judgment in James's case today, as well, in *James Pearson v. Commonwealth*, 2017-SC-000672-MR (Ky. June 13, 2019).

[2] Ky. Const. § 110(2)(b) ("Appeals from a judgment of the Circuit Court imposing a sentence of . . . imprisonment for twenty years or more shall be taken directly to the Supreme Court.").

# I. BACKGROUND.

Officer Greg Ullrich responded to a call informing emergency authorities that a house at 912 Leonard Street was on fire. By the time Officer Ullrich arrived at the scene, the house was engulfed in flames. As he was assisting with crowd control, a neighbor, Jerome Fredrick, approached him. Fredrick informed Officer Ullrich that the security cameras on his house captured images of two men making repeated trips from the direction of the 912 Leonard Street residence to another house on that same street, 926. The men were carrying objects away from the direction of the 912 residence before the fire.

Acting on this information, police surveilled the 926 Leonard Street residence. They saw James exit that residence and stopped him. He was carrying a black duffel bag containing, among other things, an Xbox gaming console and video games. Morgan Salisbury, the homeowner of the burnt residence at 912 Leonard Street, identified those items as belonging to him.

After obtaining a search warrant, police searched the 926 Leonard Street residence and found other items that Salisbury identified as belonging to him, including two televisions, a .410 shotgun, the shotgun's case, an e-reader, a laptop, and a digital voice recorder. Police also arrested John, James's brother, on the premises of the 926 Leonard Street residence.

John and James were both indicted and stood trial jointly. The jury convicted John of first-degree burglary, second-degree arson, and of being a first-degree persistent felony offender, while convicting James of first-degree burglary and of being a first-degree persistent felony offender but acquitting

2

James of second-degree arson. At a separate trial, John was also found guilty of possession of a firearm by a convicted felon.

## II. ANALYSIS.

### A. The trial court did not err in refusing to grant a mistrial.

John first argues that the trial court should have granted his motion for a mistrial. That this issue is preserved for our review is undisputed.

Captain Michael Lee of the Covington Fire Department responded to the scene of the burning Leonard Street residence. At a Daubert hearing[3] in which John questioned the ability of Captain Lee to act as an expert witness testifying about the cause of the fire, the trial court ruled that Captain Lee could not testify that the fire was intentionally set. The trial court ruled in this way because Captain Lee himself explicitly stated multiple times during the hearing that he could not testify as to whether the fire was caused intentionally or accidentally.

At trial, the Commonwealth asked Captain Lee, "What is your opinion regarding the categories of causation as it relates to this fire?" and Captain Lee responded, "My opinion would be that this fire was intentionally set." John immediately objected and moved for a mistrial. Recognizing that Captain Lee's testimony violated the pretrial order, the trial court admonished the jury to disregard Captain Lee's statement that the fire was intentionally set.

---

[3] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (trial court must assess qualifications of expert witness when competency of that expert to testify is challenged).

3

The Commonwealth then attempted to clarify Captain Lee's statement. After using the process of elimination, the Commonwealth asked Captain Lee if there was any indication that the fire was caused accidentally, to which Captain Lee responded that he found no evidence to indicate that the fire was caused accidentally. John made another objection, to which the trial court responded by noting the Commonwealth's ineffective attempt to clarify Lee's statements. The trial court told the Commonwealth that it must make clear that Captain Lee testified at the Daubert hearing that he could not tell if the fire was accidental or intentional. If the Commonwealth did not do this, the trial court said, the trial court would grant John's motion for a mistrial.

After some back and forth between the Commonwealth and Captain Lee, Captain Lee admitted, three times, that he could not definitively determine whether the fire started because of an intentional or accidental act.

After Captain Lee finished testifying, the trial court reviewed that testimony outside the presence of the jury and conducted a hearing on the issue. The trial court determined that it needed to admonish the jury to make clear that Captain Lee's testimony at his Daubert hearing versus his testimony at trial contradicted itself. The trial court rather emphatically admonished the jury in the following way:

> The witness on the stand, Captain Lee, was qualified as an expert in arson investigation. We previously had a hearing to determine the extent of his testimony before you as [to what] an expert would be allowed to say because there are rules that govern testimony by experts or non-experts, so we had a hearing on that last week. At that hearing, the witness said that he would not, would not, be able to tell you under oath as an expert that this fire was intentionally set. It was undetermined, it was human cause,

4

whether it was intentional or accidental he could not say. I replayed the testimony that you heard a while ago where he said it was intentional. Disregard that statement! Disregard that testimony because it contradicts what was told to this Court at a prior hearing! Got it?

"Whether to grant a mistrial is within the sound discretion of the trial court, and 'such a ruling will not be disturbed absent . . . an abuse of that discretion.'"[4] "A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity."[5] "Although a trial court is vested with discretion on granting a mistrial, the power to grant a mistrial ought to be used sparingly and only with the utmost caution, under urgent circumstances, and for very plain and obvious causes."[6] "Simply put, 'the error must be "of such character and magnitude that a litigant will be denied a fair and impartial trial and *the prejudicial effect can be removed in no other way* except by grant of a mistrial.""[7]

"In conjunction with the foregoing principles, we have consistently held that a mistrial is improper when the taint of improper information going to the jury can be cured with an admonition."[8] "In fact, so strong is our faith in the

---

[4] *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky. 2005) (quoting *Woodard v. Commonwealth*, 147 S.W.3d 63, 68 (Ky. 2004)).

[5] *Id.*

[6] *Commonwealth v. Scott*, 12 S.W.3d 682, 685 (Ky. 2000) (citing *Glover v. McMackin*, 950 F.2d 1236, 1240 (6th Cir. 1991)).

[7] *Cardine v. Commonwealth*, 283 S.W.3d 641, 647 (Ky. 2009) (emphasis in original) (cleaned up) (quoting *Bray*, 177 S.W.3d at 752)) (quoting *Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996)).

[8] *Sneed v. Burress*, 500 S.W.3d 791, 804 (Ky. 2016) (Venters, J., dissenting) (citing *Matthews v. Commonwealth*, 163 S.W.3d 11, 17 (Ky. 2005)).

efficacy of an admonition to cure the taint of improper evidence that we allow for *only two* circumstances in which an admonition will be deemed to be an insufficient cure: 1) when there is 'an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant;' *or* 2) 'when the improper question was asked [or other improper information imported] without a factual basis *and* was inflammatory or highly prejudicial.'"[9]

Although Captain Lee's testimony is arguably "devastating to" John, we have no reason to believe that the jury was "unable to follow the court's admonition." Our review of the trial court's admonition reveals a clear instruction conveyed to the jury in detail about the reasons it was necessary for the jury to disregard Captain Lee's testimony, in addition to the specific testimony the trial court told the jury to disregard. Moreover, the way the trial court delivered the admonition convinces us that the jury got the message—the trial court conveyed its frustration with the Commonwealth for having blatantly disregarded its order, which is made abundantly clear by the trial court's tone as it instructed the jury to disregard Captain Lee's statement regarding the intentional nature of the starting of the fire. Simply put, the trial court's admonition leaves no doubt as to its effectiveness.

---

[9] *Sneed*, 500 S.W.3d at 804 (Venters, J., dissenting) (emphasis in original) (quoting *Bartley v. Commonwealth*, 400 S.W.3d 714, 735 (Ky. 2013); *Parker v. Commonwealth*, 291 S.W.3d 647, 658 (Ky. 2009); *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003)).

Additionally, while it may be argued that Captain Lee's testimony was "inflammatory or highly prejudicial," we cannot say that it was "without a factual basis." Whether the fire was started intentionally or accidentally was one of the ultimate issues for the jury to decide. As we discuss below, we are satisfied from the trial record that the evidence presented at trial reasonably supports the conclusion that the fire was started intentionally.

As such, we cannot say that the trial court's admonition failed to cure the Commonwealth's blatant disregard of its order. The trial court did not err in denying John's motion for a mistrial.

## B. The trial court did not err in denying John's motion for a directed verdict on his second-degree arson charge.

Next, John argues that the trial court should have granted his motion for a directed verdict on his second-degree arson charge. That this issue is preserved for our review is undisputed.

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."[10]

"A person is guilty of arson in the second degree when he starts a fire . . . with intent to destroy or damage a building . . . of another[.]"[11] John argues that insufficient evidence exists in this case to support the conclusion that he

---

[10] *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)).

[11] Kentucky Revised Statutes ("KRS") 513.030(1)(a).

7

*intended* to set fire to the Salisbury residence. John also argues that the jury's concluding so required an improper piling up of inferences.

Neighbor Jerome Fredrick's security tapes reveal that two individuals went to and from the direction of the Salisbury residence and the 926 Leonard Street residence, hauling items from the direction of the Salisbury residence to the 926 Leonard Street residence. The stolen items found in the 926 Leonard Street residence belonged to Salisbury. Shortly after the men made their final trip from the Salisbury residence to the 926 Leonard Street residence, the house erupted in flames. Firefighters responding to the scene reported that water draining from the building appeared to burn and smelled of gasoline. Authorities found empty gas cans on the front porch and in the basement of the 926 Leonard Street residence where John and James were apprehended and where they lived.

The inference from these facts presented by the Commonwealth is that John and James burned down the Salisbury residence to cover up their burglary. "A jury is entitled to draw all reasonable inferences from the evidence[.]"[12] "An inference is the act performed by the jury of inferring or reaching a conclusion from facts or premises in a logical manner so as to reach a conclusion. A reasonable inference is one in accordance with reason or sound

---

[12] *Moore v. Commonwealth*, 462 S.W.3d 378, 388 (Ky. 2015) (quoting *Toler v. Sud–Chemie, Inc.*, 458 S.W.3d 276, 287 (Ky. 2014)) (citing *Beatrice Foods Co. v. Chatham*, 371 S.W.2d 17, 19 (Ky. 1963)).

thinking and within the bounds of common sense without regard to extremes or excess."[13]

We do not find it unreasonable for the jury to have believed that John set fire to the Salisbury residence to cover his crime of burglary. Numerous items of valuable property were found to have been taken by John and James from the Salisbury residence. John's having set the Salisbury house afire to make the property owners think that their missing property had simply been consumed in the conflagration is not an unreasonable inference for the jury to have made.

Regarding John's argument that finding him guilty of arson required a piling on of inferences:

> Admittedly, this Court's predecessor stated at one time in a criminal case that "[t]he jury may not in determining the facts base an inference upon an inference." But this "rule" cannot bar all inferences based on other inferences, despite being stated in absolute terms. If that were the case, then the exercise of logic, which frequently employs inference-derived inferences, would not be allowed to the jury. But logic, like common sense, "must not be a stranger in the house of the law." Indeed, the law requires logical, reasonable inferences and decisions, rather than those driven by passion and emotion.
>
> Thus, the so-called rule, stated in absolute terms, has been roundly criticized[.] . . . And in light of the criticism, "the modern trend is to abandon rules limiting the use of circumstantial evidence, *including an inference upon an inference.*"
>
> And Kentucky has abandoned the absolute "rule," having replaced it with the inference-upon-inference "principle." As articulated . . . , the principle is intended to condemn inferences that build upon inferences in an unreasonable manner.[14]

---

[13] *Martin v. Commonwealth*, 13 S.W.3d 232, 235 (Ky. 1999).

[14] *Southworth v. Commonwealth*, 435 S.W.3d 32, 45–46 (Ky. 2014) (internal citations omitted) (emphasis in original).

9

If inferences have not been built "in an unreasonable manner," the jury is permitted to make inference upon inference. And we cannot say that the jury unreasonably inferred anything or that numerous inferences built off each other in this case. The images of two men were captured on tape making multiple trips hauling objects from the Salisbury residence in the direction of the 926 Leonard Street residence. Police found John and James at the 926 Leonard Street residence, the location identified by neighbor Jerome Fredrick where John and James both resided. Police found items belonging to Salisbury at the 926 Leonard Street residence. The fire in the Salisbury residence started soon after the men's last trip there. Firefighters smelled gasoline emanating from water gushing from the burning Salisbury residence. And empty gas cans were found at the 926 Leonard Street residence. We find nothing unreasonable about the jury's having concluded that John was one of the men on the security camera traveling from the Salisbury residence to the 926 Leonard Street residence, taking property as he went, and having set fire to the Salisbury residence down to hide his burglary.

Finally, while John points to evidence supporting his case, this does not discount the evidence against him.[15] In sum, we cannot say that it was "clearly

---

[15] John makes much of the fact that what he terms "extensive" scientific testing of the couch in the Salisbury residence, the place where Captain Lee testified as the place of the origin of the fire, revealed no traces of accelerants. Although this evidence supports John's assertion that the fire may have been accidental, this evidence conflicts with Captain Lee's testimony that he smelled gas fumes emanating from the house. This conflict was for the jury to resolve, and we cannot say that its finding of John's guilt in this way was unreasonable.

unreasonable" for the jury to have found that John intentionally burned the Salisbury residence to cover his tracks in his commission of the burglary.

### C. Any purported trial court error in allowing an identification of John to be made through the security tapes was harmless beyond a reasonable doubt.

John also argues that the trial court should not have allowed neighbor Jerome Fredrick to identify John on the security tapes. That this issue is preserved for our review is undisputed.

As mentioned, Jerome Fredrick had security cameras set up to view the street in front of his home. The Commonwealth called Fredrick as a witness to identify the men depicted in the security tapes. Fredrick testified that he knew the owner of the 926 Leonard Street residence and that he knew that John and James lived there, as well, but he did not know their names. Fredrick then testified that the two men on the video were the two men who lived with the owner.

On cross-examination, John was able to elicit from Fredrick that his purported identification of the two men on the tapes was essentially a guess because the tapes obscure their faces:

> Defense: You would agree with me that you can't see the faces of the individuals on your video?
>
> Fredrick: No sir.
>
> Defense: You *can't* see the faces.
>
> Fredrick: Oh yeah, I agree with you.
>
> . . .
>
> Defense; You would agree with me, you're guessing as to who's on that video, correct?

11

Fredrick: More or less, yes sir.

On redirect, the Commonwealth wanted Fredrick to make an in-court identification of the individuals he believed to be depicted on the security tapes. Over defense objection based on the unreliability of the identification, the trial court allowed Fredrick to identify John and James as the men on the tapes.

John now argues that the trial court erred in allowing Fredrick to identify John and James as the men on the tapes. While John's argument is well-taken, we are convinced that any purported error is harmless beyond a reasonable doubt.

"No error in . . . the admission . . . of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice."[16] "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."[17] "[T]he inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[18] "As to those preserved constitutional errors

---

[16] Kentucky Rules of Criminal Procedure ("RCr") 9.24.

[17] *Id.*

[18] *Murray v. Commonwealth*, 399 S.W.3d 398, 404 (Ky. 2013) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

which are subject to harmless error review, they must be shown to be 'harmless beyond a reasonable doubt' to be deemed harmless."[19]

Here, the jury saw the tapes and could see for themselves that no one could see the faces of the men shown on the tapes themselves—the faces of the men are too obscured. Not only that, but John was able to get Fredrick to admit that he was simply guessing as to the men's identities based on his knowledge that John and James lived at the 926 Leonard Street residence. In sum, the jury heard and saw how reliable, or rather more appropriately termed unreliable, was Fredrick's identification of the men on the tapes. We fail to see how the totality of Fredrick's testimony prejudiced John.

The only impact Fredrick's testimony had on the jury was potentially to remove an inference that it would have had to make to convict John and James. As mentioned, the tapes reveal that two individuals went to and from the direction of the Salisbury residence and the 926 Leonard Street residence, hauling items from and to as they went. The stolen items found in the 926 Leonard Street residence belonged to Salisbury. John does not take issue in any way with Fredrick's testimony that he knew of two men that lived at the Leonard Street residence and that those men were John and James. And police found John and James at the 926 Leonard Street residence. Putting all of this together, the jury itself could have inferred that the two men in the video were

---

[19] *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010) (quoting *Kotteakos*, 328 U.S. at 765).

13

John and James. We cannot say that Fredrick's speculative identification had really any impact on the jury.

Any purported error committed by the trial court in allowing Fredrick to identify John and James on the security tapes was harmless beyond a reasonable doubt.

## D. The trial court did not err in denying John's motion for directed verdict on the charge of possession of a firearm by a convicted felon.

Finally, John takes issue with the trial court's denial of his motion for a directed verdict on the possession of a firearm by a convicted felon charge. That this issue is preserved for our review is undisputed.

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."[20]

The theory the Commonwealth proffered to support its possession of a firearm by a convicted felon charge was that John, a convicted felon, exercised possessory control over the shotgun that he stole from the Salisbury residence, this shotgun being found in the 926 Leonard Street residence and argued as being seen on the security tapes taken by the two men who were going to and from the Salisbury residence and the Leonard Street residence.

"A person is guilty of possession of a firearm by a convicted felon when he possesses . . . a firearm when he has been convicted of a felony[.]"[21]

---

[20] *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)).

[21] KRS 527.040(1).

14

"Possession may be proven through either actual possession or constructive possession."[22] "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and intention at a given time to exercise dominion and control of an object, either directly or through others."[23]

In this case, one of the men on the video tapes was seen taking a shotgun case from the Salisbury residence to the 926 Leonard Street residence. Police arrested John and James on the premises of the 926 Leonard Street residence. John does not contest that he was living at 926 Leonard Street at the time. Police found the shotgun at the 926 Leonard Street residence. Considering all the above, it was reasonable for the jury to infer that John exercised possessory control of the shotgun.

John argues that the man holding the shotgun case in the security tapes more resembles James than him. But, as noted earlier, it is impossible to tell from the video the identities of the men depicted there. And simply because James allegedly was the one carrying the shotgun case and John allegedly was the one carrying the TV does not take away from the fact that both individuals could have shared the loot.

John also points out that the shotgun was found near James's bed, not his. John argues that this fact proves that James, rather than John, was the

[22] *Johnson v. Commonwealth*, 90 S.W.3d 39, 42 (Ky. 2002) (overruled on other grounds by *McClanahan v. Commonwealth*, 308 S.W.3d 694 (Ky. 2010)) (citing *U.S. v. Kitchen*, 57 F.3d 516, 520 (7th Cir. 1995)).

[23] *Id.* (quoting *U.S. v. Garrett*, 903 F.2d 1105, 1110 (7th Cir. 1990)).

individual exercising possessory control of the shotgun. But simply because James may have had the shotgun in his room at that time does not negate the fact that John could still exercise constructive possession of the shotgun. It is reasonable for the jury to have believed that James and John shared in the spoils of their burglary. Simply because James appeared to be taking his turn in exercising control of the shotgun at one point in time does not take away from John's ability to exercise control of the shotgun as well.

We are satisfied that the jury reasonably found John to be in possession of a firearm to be convicted of possession of a firearm by a convicted felon.

## III.      CONCLUSION.

Finding no reversible error, we affirm the entirety of the judgment.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Karen Shuff Maurer
John Gerhart Landon
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Kenneth Wayne Riggs
Assistant Attorney General